**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| **Justin Ward** and **Nikiya Ward,** | |
|     Plaintiffs, | |
| | CIVIL ACTION |
| v. | FILE NO. _____ |
| **J.C. LEWIS Motor Company; Walter** **Lewis; Stephen Staton; Marjorie Solomon;** and **Mike Offer,** | **JURY TRIAL DEMANDED** |
|     Defendants. | |

**VERIFIED COMPLAINT**

Plaintiffs Justin Ward and Nikiya Ward file this Complaint against Defendants J.C. Lewis Motor Company, Walter Lewis, Stephen Staton, Marjorie Solomon, and Mike Offer, and allege as follows.

**I. PARTIES**

1.     Plaintiff Justin Ward is a citizen of the State of Georgia.

2.     Plaintiff Nikiya Ward is a citizen of the State of Georgia.

3.     Plaintiffs Justin Ward and Nikiya Ward are married.

4.     Defendant J.C. Lewis Motor Company is a Georgia corporation.

5.     Defendant J.C. Lewis Motor Company maintains its principal place of business at 501 Memorial Blvd., Pooler, Georgia.

6.     Defendant J.C. Lewis Motor Company employed Justin Ward.

7.     Defendant Walter Lewis is a citizen of the State of Georgia.

8.     Defendant Walter Lewis is the owner and president of J.C. Lewis Motor Company.

9.     Defendant Stephen Staton is a citizen of the State of Georgia.

10.    At all times relevant, Staton served as a Group General Manager of J.C. Lewis Motor Company, where he possessed and exercised independent corporate authority to manage personnel operations, dictate corporate pay plans, and make unilateral hiring and firing decisions on behalf of the company, thereby acting as an employer under the FMLA.

11.    Defendant Marjorie Solomon is a citizen of the State of Georgia.

12.    At all times relevant, Solomon served as the Human Resources and Compliance Manager of J.C. Lewis Motor Company, where she possessed and exercised direct operational control over the administration of employee medical leave, the verification of medical excuses, and the tracking of FMLA-qualifying absences, thereby acting as an employer under the FMLA.

13. Defendant Mike Offer is a citizen of the State of Georgia.

14. Offer is a former Group General Manager and member of the Executive Leadership Team ("ELT") of J.C. Lewis Motor Company. In his executive capacity, Offer possessed and exercised substantial corporate authority to alter, manage, and dictate the terms, compensation structures, and conditions of employment for dealership personnel.

15. In their respective executive roles, Defendants Lewis, Staton, Solomon, and Offer each exercised substantial, direct operational and managerial control over the specific facets of Justin Ward's employment that form the basis of his statutory and tort claims, including the authority to dictate or reduce his compensation, control his workplace system access, manage his medical leave, and execute or participate in his demotions and termination.

16. Each individual Defendant is sued in his or her individual capacity for conduct in which he or she personally participated, as set forth below.

## II. SERVICE OF PROCESS

The Defendants may be served with process at the following addresses:

- J.C. Lewis Motor Company, by its registered agent, Curtis Lewis III at 501 Memorial Blvd., Pooler, GA 31322.
- Walter Lewis: 501 Memorial Blvd., Pooler, GA 31322.
- Stephen Staton: 501 Memorial Blvd., Pooler, GA 31322.
- Marjorie Solomon: 501 Memorial Blvd., Pooler, GA 31322.
- Mike Offer: 1238 Wilmington Island Rd., Savannah Ga 31410.

## III. JURISDICTION AND VENUE

17. This action arises under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.

18. This Court has subject-matter jurisdiction over the federal claims under 28 U.S.C. § 1331.

19. This Court has supplemental jurisdiction over the Georgia state-law claims under 28 U.S.C. § 1367(a).

20. This Court has personal jurisdiction over each Defendant because each Defendant is a Georgia citizen or a Georgia corporation and the conduct alleged occurred in Georgia.

21. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.

22. Assignment to the Savannah Division is proper because the dealership where Justin Ward worked is located in Chatham County, Georgia.

## IV. ADMINISTRATIVE EXHAUSTION AND CONDITIONS PRECEDENT

23. Justin Ward filed a charge of discrimination (Charge No. 415-2026-01306) with the Equal Employment Opportunity Commission on April 2, 2026.

24. The EEOC issued Justin Ward a Notice of Right to Sue the same day, April 2, 2026.

25. This action is timely filed within ninety days of the Notice of Right to Sue letter..

26. Justin Ward's claims under 42 U.S.C. § 1981, the Family and Medical Leave Act, and Georgia law require no administrative exhaustion.

## V. FACTUAL ALLEGATIONS

27. Justin Ward is Black.

28. Ward began working for J.C. Lewis Motor Company in 2018 as a salesperson.

29. J.C. Lewis promoted Ward to finance manager within four months of his hire.

30. J.C. Lewis promoted Ward to sales manager approximately six months later.

31. J.C. Lewis promoted Ward to General Sales Manager of J.C. Lewis Ford – Savannah by August 2023.

32. Ward never received any formal discipline during his employment with J.C. Lewis.

33. Mike Offer, a member of the executive leadership team ("ELT"), engaged in a romantic relationship with one of Ward's subordinates, Jeana Burke.

34. Ward was unaware of the romantic relationship between Offer and Burke.

35. Offer had influence over the terms and conditions of Burke and Ward's employment.

36. Ward ensured the salespeople he managed followed company policy, including Burke.

37. In May 2024, without warning, Ward was demoted from his position as General Sales Manager.

38. Ward was constructively discharged in May 2024.

39. Offer participated in the executive decisions that demoted Ward, reduced his compensation, and led to his constructive discharge.

40. Offer remained employed.

41. On or about October 2024, Ward applied for a Finance Manager position with J.C. Lewis.

42. Staton responded to Ward's application and asked if Ward would be interested in a Sales Manager position to help the store increase their sales.

43. Ward interviewed with Staton, Offer, and Mike Emory for the Sales Manager position.

44. Ward made it explicitly clear that he would only return if he was guaranteed a monthly salary.

45. Ward demanded a guaranteed salary because, during his previous tenure as General Sales Manager, he began suspecting that leadership, including Defendants Mike Offer and Stephen Staton, was actively manipulating the Savannah dealership's operational books to suppress profit metrics.

46. Knowing that his compensation had previously been tethered to manipulated figures, Ward refused to accept a commission-based pay structure, resulting in the negotiation of a contract guaranteeing him a flat salary of $17,000 per month.

47. Offer sent Ward an offer letter guaranteeing a $17,000 monthly salary, which Ward signed.

48. Ward's 2024 offer letter used the word "salary."

49. The Savannah dealership's sales stood at negative 51.8 percent in the month before Ward returned.

50. Within a month of Ward's return, the Savannah dealership finished 8.7 percent ahead of projections.

51. For the remainder of 2024, the Savannah dealership met or exceeded projections.

52. On or about January 2025, Staton and Patrick Kennedy, the General Sales Manager of the Savannah dealership, attempted to convince Ward to change his pay plan and remove his salary.

53. Ward refused and reminded them that a guaranteed salary was a condition of his return.

54. Despite this explicit refusal, Staton, Kennedy, and Group General Manager Julian Lewis initiated a coordinated campaign of approaching Ward (both together and separately) to convince him to change his pay plan.

55. On March 4, 2026, Staton, Kennedy, and Julian Lewis told Ward they were changing his pay.

56. Kennedy presented Ward with a drastically reduced $13,000 draw contract that was dated March 1, 2026.

57. Ward asked for time to think about it.

58. Kennedy approached Ward on March 9, 2026 with a strict ultimatum: sign the new agreement or be fired immediately.

59. Ward was forced to sign the contract under extreme duress.

60. Ward signed the new agreement on March 9, 2026.

61. The new agreement reduced Ward's guaranteed $17,000 salary to a $13,000 monthly draw.

62. The new agreement labeled the $13,000 a "draw," which is recoverable from future earnings.

63. Between March 12 and March 22, 2026, Ward visited the emergency department three times.

64. On March 16, 2026, Ward's blood pressure was recorded at 215 over 106.

65. The March 16, 2026 ED Provider Report attributed Ward's symptoms to work stress.

66. Ward provided J.C. Lewis with medical excuses for the time he was unable to work because of a serious health condition.

67. Ward had been employed by J.C. Lewis for at least twelve months and worked at least 1,250 hours during the twelve-month period before his March 2026 absences.

68. J.C. Lewis employed at least fifty employees within seventy-five miles of Ward's worksite.

69. On March 19, 2026, Ward met with Marjorie Solomon, the HR Manager, at the Savannah dealership.

70. Ward audio-recorded the March 19, 2026 meeting.

71. During the March 19, 2026 meeting, Ward reported white employees being treated more favorably than Black employees.

72. During this meeting, Ward also complained about a lack of diversity in leadership.

73. During the meeting, Solomon stated she had to protect J.C. Lewis's interest."

74. Solomon confirmed she would report this meeting to leadership.

75. During the meeting, Solomon asked Ward "If you're so unhappy and under so much stress, do you think you need to leave?"and "[s]o your sense of worth is tied to money?"

76. Two days after the March 19 meeting, Solomon sat next to Ward at his desk in the manager's office for approximately four hours, which had never happened before to Ward or any other employee.

77. On March 21, 2026, Staton directed that the sales teams be restructured to remove the top-performing salespeople from Ward's team.

78. On March 25, 2026, the morning he returned to work after taking sick leave per the ER doctor's recommendation, Ward discovered he was locked out of J.C. Lewis's computer systems.

79. Later that morning, Solomon called Ward to ask when he expected to arrive at work.

80. Ward told Solomon he was driving to a follow-up medical appointment and would be at the dealership following the medical appointment.

81. Staton then "appeared" on the call and abruptly terminated Ward's employment, citing for the first time an unverified accusation that Ward had forwarded business emails to his personal email account.

82. J.C. Lewis fired Ward just 6 days after his meeting with HR.

83. Between August 2023 and March 2026, Ward oversaw the generation of approximately $31 million in variable gross profit.

84. In December 2024, Ward logged 539 outbound calls, 624 texts, and 363 emails.

85. Ward's pay plans prior to October 2024 were commission-based with incentives available through Ford Motor Company.

86. Ward never received more than $18,000 in any month during his employment at J.C. Lewis, although he should've yielded at least $25,000 during some months when he was General Sales Manager. Ex. A.

87. Ward received no manufacturer incentives after his October 2024 return.

88. The manufacturer incentives Ward earned were specific, identifiable sums designated for payment to him.

89.    J.C. Lewis received those manufacturer incentive funds and retained them rather than paying them to Ward.

90.    Ward demanded payment of the withheld manufacturer incentive funds, and J.C. Lewis refused to pay them.

Comparators

91.    J.C. Lewis created and promoted a discriminatory and hostile work environment in which white employees, supervised by the same executive leadership team and governed by the same company policies as Ward, were treated far more favorably than Ward for conduct that was comparable to or more serious than any conduct attributed to Ward.

92.    Joe Welch berated and used racial slurs against employees and customers, including Ward, on multiple occasions.

93.    J.C. Lewis continued to employ Joe Welch for years despite repeated reports of his discriminatory actions.

94.    Mike Johnson engaged in a prohibited relationship with a subordinate in August 2022.

95.    J.C. Lewis rehired Mike Johnson approximately two months after firing him and later promoted him to a General Manager position.

96.    Nicole Kelly forged customer signatures on documents.

97.    J.C. Lewis continued paying Nicole Kelly while she was on leave.

98.    J.C. Lewis gave Ethan Lesondak a $6,000 monthly raise during the same period it cut Ward's pay.

99.    Offer engaged in fraternization with Burke that was against company policy, then demoted Ward when Burke complained to him about Ward.

100.    J.C. Lewis paid Offer (or did not require prorated reimbursement of) his full $2.5 million annual salary when he was eventually terminated.

101.    Burke engaged in fraternization with Offer.

102.    J.C. Lewis paid Burke a severance when she was terminated.

103.    Mike Offer, Jeana Burke, Joe Welch, Mike Johnson, Nicole Kelly, and Ethan Lesondak are white, held roles comparable in seniority and responsibility to Ward's, were subject to the same company conduct policies as Ward, and were supervised by the same executive leadership team responsible for the adverse actions taken against Ward.

104.    J.C. Lewis systemically and systematically removed Black executives while rewarding white employees.

105.    James Eady, the first (and only) Black member of the executive leadership team in the company's 100-plus year history, was constructively discharged in Fall 2024 after 22 years of employment. Ex. A.

106.    Clarence Gadsen, a Black Corporate Finance Director, was demoted under an ultimatum in May 2025.

107.   John Delaney, a Black man who was the Marketing Director for nearly a decade was constructively discharged on or around March 31, 2026 due to the targeted harassment and hostile work environment created by Christian Lewis, an Owner of J.C. Lewis, who wanted his own daughter to have Delaney's position.

108.   Christian Lewis's daughter now holds the marketing manager position.

109.   Walter Lewis wrote in an internal email that the company's turnover consisted of "mostly [B]lack employees."

## VI. CAUSES OF ACTION

### COUNT I. RACE DISCRIMINATION (42 U.S.C. § 1981)
*(Against J.C. Lewis Motor Company, Walter Lewis, Stephen Staton, and Mike Offer)*

110.   Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 27, 37, 38, 52 through 56, 61, 81, and 91 through 109, as if fully set forth herein.

111.   Justin Ward is Black, as alleged in paragraph 27.

112.   J.C. Lewis demoted Ward from General Sales Manager in May 2024 and constructively discharged him from that position, as alleged in paragraphs 37 and 38.

113.   Mike Offer, a member of the executive leadership team, personally participated in the executive decisions that demoted Ward, reduced his compensation, and led to his constructive discharge, as alleged in paragraph 39.

114.   Beginning in January 2025, Stephen Staton and Patrick Kennedy, joined by Group General Manager Julian Lewis, approached Ward multiple times to coerce Ward into surrendering his guaranteed salary, which culminated in Kennedy's presentation of a unilaterally reduced $13,000 draw contract, as alleged in paragraphs 52 through 56.

115.   J.C. Lewis reduced Ward's guaranteed $17,000 monthly salary to a $13,000 recoverable draw in March 2026, as alleged in paragraph 61, and terminated his employment on March 25, 2026, as alleged in paragraph 81.

116.   J.C. Lewis treated similarly situated white employees, including Mike Offer, Jeana Burke, Joe Welch, Mike Johnson, Nicole Kelly, and Ethan Lesondak, far more favorably than Ward for conduct comparable to or more serious than any conduct attributed to Ward, and Offer remained employed notwithstanding his own fraternization policy violation, as alleged in paragraphs 40 and 91 through 103.

117.   J.C. Lewis systematically removed Black executives, including James Eady, Clarence Gadsen, and John Delaney, while rewarding the white comparators described above, and Walter Lewis, the company's owner and president, personally acknowledged this pattern in a written internal email stating that company's turnover consisted of employees who were "mostly [B]lack," as alleged in paragraphs 104 through 109. *See generally,* Ex. A.

118.   Ward's race was a but-for cause of the demotion, pay reduction, and termination described above.

119.   This conduct violated 42 U.S.C. § 1981.

120.   Ward suffered lost wages, lost benefits, and emotional distress as a result.

121. The Defendants acted with malice or reckless indifference to Ward's federally protected rights.

### COUNT II. HOSTILE WORK ENVIRONMENT (42 U.S.C. § 1981)

*(Against J.C. Lewis Motor Company, Walter Lewis, Stephen Staton, and Marjorie Solomon)*

122. Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 27, 73 through 75, 92, 93, and 104 through 109, as if fully set forth herein.

123. Justin Ward is Black, as alleged in paragraph 27.

124. Joe Welch used racial slurs against employees and customers, including Ward, on multiple occasions, and J.C. Lewis continued to employ Welch for years despite repeated reports of his conduct, as alleged in paragraphs 92 and 93.

125. J.C. Lewis systematically removed or demoted its Black executives, including James Eady, Clarence Gadsen, and John Delaney (and ultimately, Ward), and Walter Lewis personally acknowledged in a written internal email that the company's turnover consisted of employees who were "mostly [B]lack," as alleged in paragraphs 104 through 109.

126. This race-based conduct was sufficiently severe or pervasive to alter the conditions of Ward's employment and create an abusive working environment.

127. When Ward reported this conduct to Marjorie Solomon, the company's Human Resources and Compliance Manager, on March 19, 2026, Solomon personally told him she "had to watch J.C. Lewis's interest," personally confirmed she would report his complaint to the leadership he was complaining about, and personally asked whether he needed to leave the company, as alleged in paragraphs 73 through 75.

128. Solomon's response left Ward with no meaningful avenue to redress the harassment he reported and instead signaled that the company's human-resources function operated to protect the company rather than to remedy discrimination.

129. This conduct violated 42 U.S.C. § 1981.

130. Ward suffered damages as a result.

131. The Defendants acted with malice or reckless indifference to Ward's federally protected rights.

### COUNT III. RETALIATION (42 U.S.C. § 1981)

*(Against J.C. Lewis Motor Company, Stephen Staton, and Marjorie Solomon)*

132. Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 71 through 82, as if fully set forth herein.

133. On March 19, 2026, Ward engaged in protected activity by reporting to Marjorie Solomon that Black employees were treated more favorably than white employees and by complaining about the lack of diversity in leadership, as alleged in paragraphs 71 and 72.

134. Solomon personally confirmed that she "had to watch J.C. Lewis's interest" and personally confirmed that she would report Ward's protected complaint to the very leadership about whom he was complaining, as alleged in paragraphs 73 and 74.

135. Two days later, on March 21, 2026, Solomon personally surveilled Ward by sitting beside him in the manager's office for approximately four hours, and Stephen Staton personally directed that the sales teams be restructured to remove the top-performing salespeople from Ward's team, as alleged in paragraphs 76 and 77.

136. On March 25, 2026, Ward discovered he had been locked out of J.C. Lewis's computer systems, and Staton personally terminated Ward's employment by telephone that same morning, citing for the first time an unverified accusation regarding Ward's use of his personal email account, as alleged in paragraphs 78 and 81.

137. J.C. Lewis terminated Ward just six days after his protected complaint to Solomon, as alleged in paragraph 82.

138. Solomon's confirmation that she would communicate Ward's protected complaint to the leadership (who terminated him six days later), followed immediately by her own surveillance of Ward, was direct and proximate personal participation in the retaliation against Ward.

139. Ward's protected complaint was a but-for cause of the surveillance, restructuring, and termination described above.

140. This conduct violated 42 U.S.C. § 1981.

141. Ward suffered damages as a result.

142. The Defendants acted with malice or reckless indifference to Ward's federally protected rights.

### COUNT IV. RACE DISCRIMINATION (Title VII, 42 U.S.C. § 2000e-2)
*(Against J.C. Lewis Motor Company)*

143. Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 27, 28 through 32, 37, 38, 41, 44, 47, 48, 52 through 59, 61, 78, 81, 98, 91 through 103, and 104 through 109, as if fully set forth herein.

144. Justin Ward is Black, as alleged in paragraph 27.

145. Ward began his employment with J.C. Lewis in 2018 and was promoted three times based on merit, receiving no formal discipline throughout his tenure, as alleged in paragraphs 28 through 32.

146. J.C. Lewis demoted Ward from General Sales Manager in May 2024 and constructively discharged him from that position, as alleged in paragraphs 37 and 38.

147. When J.C. Lewis induced Ward to return in October 2024, it did so only after negotiating and signing a written guarantee of a $17,000 monthly salary, as alleged in paragraphs 41, 44, 47, and 48.

148. Beginning in January 2025, J.C. Lewis's management engaged in a coordinated campaign to strip Ward of that guaranteed salary, culminating in a unilaterally reduced $13,000 draw contract that Ward was forced to sign under an ultimatum, as alleged in paragraphs 52 through 59.

149.    Within the charging period, J.C. Lewis reduced Ward's guaranteed compensation, as alleged in paragraph 61, locked him out of its computer systems, as alleged in paragraph 78, and terminated him, as alleged in paragraph 81.

150.    J.C. Lewis paid Ward at the reduced rate in each pay period following the reduction.

151.    Each such paycheck constituted a separate unlawful employment practice.

152.    J.C. Lewis raised Ethan Lesondak's pay by $6,000 per month during the same period it cut Ward's pay, as alleged in paragraph 98.

153.    J.C. Lewis treated similarly situated white employees more favorably than Ward, as alleged in paragraphs 91 through 103.

154.    J.C. Lewis systematically removed Black executives while rewarding the white comparators described above, and Walter Lewis, the company's owner and president, personally acknowledged this pattern in a written internal email stating that the company's turnover consisted of employees who were "mostly [B]lack," as alleged in paragraphs 104 through 109.

155.    J.C. Lewis's demotion, pay reduction, computer lockout, and termination of Ward were motivated by his race.

156.    This conduct violated Title VII, 42 U.S.C. § 2000e-2.

157.    Ward suffered damages as a result.

## COUNT V. RETALIATION (Title VII, 42 U.S.C. § 2000e-3)
### (Against J.C. Lewis Motor Company)

158.    Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 71 through 82, as if fully set forth herein.

159.    On March 19, 2026, Ward engaged in protected activity by reporting to Marjorie Solomon that white employees were treated more favorably than Black employees and by complaining about the lack of diversity in leadership, as alleged in paragraphs 71 and 72.

160.    Solomon confirmed that she had to protect J.C. Lewis's interest and confirmed she would report Ward's protected complaint to the very leadership about whom he was complaining, as alleged in paragraphs 73 and 74.

161.    Two days later, on March 21, 2026, J.C. Lewis, through Solomon, surveilled Ward by sitting beside him in the manager's office for approximately four hours, and, through Staton, restructured the sales teams to remove the top-performing salespeople from Ward's team, as alleged in paragraphs 76 and 77.

162.    On March 25, 2026, Ward discovered he had been locked out of J.C. Lewis's computer systems, and J.C. Lewis terminated his employment that same morning, citing for the first time an unverified accusation regarding Ward's use of his personal email account, as alleged in paragraphs 78 and 81.

163.    J.C. Lewis terminated Ward just six days after his protected complaint to Solomon, as alleged in paragraph 82.

164.	Solomon's conduct, acting as J.C. Lewis's Human Resources and Compliance Manager, established a causal chain between Ward's protected complaint and his termination six days later.

165.	Ward's protected complaint was a but-for cause of the surveillance, restructuring, and termination.

166.	This conduct violated Title VII, 42 U.S.C. § 2000e-3.

167.	Ward suffered damages as a result.

## COUNT VI. HOSTILE WORK ENVIRONMENT (Title VII, 42 U.S.C. § 2000e-2)

*(Against J.C. Lewis Motor Company)*

168.	Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 27, 92, 93, 104 through 109, and 73 through 75, as if fully set forth herein.

169.	Justin Ward is Black, as alleged in paragraph 27.

170.	Joe Welch used racial slurs against employees and customers, including Ward, on multiple occasions, and J.C. Lewis continued to employ Welch for years despite repeated reports of his conduct, as alleged in paragraphs 92 and 93.

171.	J.C. Lewis systematically removed or demoted its Black executives, including James Eady, Clarence Gadsen, and John Delaney, and Walter Lewis personally acknowledged in a written internal email that the company's turnover consisted of employees who were "mostly [B]lack," as alleged in paragraphs 104 through 109.

172.	This race-based conduct was sufficiently severe or pervasive to alter the conditions of Ward's employment and create an abusive working environment.

173.	When Ward reported this conduct to Marjorie Solomon, the company's Human Resources and Compliance Manager, J.C. Lewis, through Solomon, left Ward with no meaningful avenue to redress the harassment, as alleged in paragraphs 73 through 75.

174.	Ward's hostile-work-environment allegations are like, reasonably related to, and grew out of the race-discrimination and retaliation allegations in his EEOC charge.

175.	Predatory pay plan manipulations, coercive ultimatums, and targeting of Ward's compensation and job titles were mechanisms of workplace harassment and exclusion.

176.	This conduct violated Title VII, 42 U.S.C. § 2000e-2.

177.	Ward suffered damages as a result.

## COUNT VII. INTERFERENCE AND RETALIATION (Family and Medical Leave Act, 29 U.S.C. § 2615)

*(Against J.C. Lewis Motor Company, Stephen Staton, and Marjorie Solomon)*

178.	Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 63 through 68, 78, 81, and 82, as if fully set forth herein.

179.	Ward had been employed by J.C. Lewis for at least twelve months and had worked at least 1,250 hours in the preceding year, as alleged in paragraph 67.

180. J.C. Lewis employed at least fifty employees within seventy-five miles of Ward's worksite, as alleged in paragraph 68.

181. Between March 12 and March 22, 2026, Ward was unable to work because of a serious health condition, evidenced by three emergency-department visits and a peak blood pressure of 215 over 106, as alleged in paragraphs 63 and 64.

182. Ward gave J.C. Lewis notice of his need for leave by providing medical excuses, as alleged in paragraph 66.

183. On March 25, 2026, the morning Ward returned to work following a medical appointment, he discovered he had been locked out of J.C. Lewis's computer systems, and J.C. Lewis terminated his employment that same morning, as alleged in paragraphs 78 and 81.

184. J.C. Lewis terminated Ward during or immediately after his medical leave and six days after he engaged in protected activity concerning race discrimination, as alleged in paragraph 82.

185. J.C. Lewis thereby interfered with Ward's FMLA rights and retaliated against him for exercising those rights.

186. This conduct violated the FMLA, 29 U.S.C. § 2615.

187. Ward suffered lost wages and benefits as a result.

## COUNT VIII. BREACH OF CONTRACT
*(Against J.C. Lewis Motor Company)*

188. Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 44 through 48, 61, 62, and 83, as if fully set forth herein.

189. J.C. Lewis, through Mike Offer, guaranteed Ward a monthly salary of $17,000 in a signed 2024 offer letter using the term "salary," as alleged in paragraphs 44 through 48.

190. Ward performed his duties under the agreement, as alleged in paragraph 83.

191. In March 2026, J.C. Lewis unilaterally reduced Ward's guaranteed $17,000 monthly salary to a $13,000 monthly draw that is recoverable from future earnings, as alleged in paragraphs 61 and 62.

192. J.C. Lewis thereby paid Ward less than the salary it had guaranteed him.

193. J.C. Lewis breached its agreement with Ward.

194. Ward suffered damages as a result.

## COUNT IX. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*(Against J.C. Lewis Motor Company, Walter Lewis, Stephen Staton, and Marjorie Solomon)*

195. Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 58, 63 through 65, and 75, as if fully set forth herein.

196. Kennedy, at the instruction of Staton, told Ward to sign a drastically reduced pay contract that day or be fired immediately, as alleged in paragraph 58.

197. While Ward was in an ongoing medical crisis, reporting discrimination, and reporting that his entire pay structure had been unilaterally changed, Solomon pressed him about whether he should leave the company, as alleged in paragraphs 63 through 65 and 75.

198. The Defendants' conduct, including Kennedy's ultimatum and Solomon's response to Ward's reporting of the hostile environment, discrimination, and medical emergencies, was extreme and outrageous.

199. Staton terminated Ward's employment while Ward was en route to a medical appointment for a condition caused by J.C. Lewis, as alleged in paragraphs 80 and 81.

200. The Defendants' conduct caused Ward severe emotional distress.

201. Ward suffered damages as a result.

## COUNT X. NEGLIGENT HIRING, RETENTION, TRAINING, AND SUPERVISION
### *(Against J.C. Lewis Motor Company)*

202. Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 92, 93, 99, 45, 250, 39, 52 through 59, and 73 through 82, as if fully set forth herein.

203. Joe Welch used racial slurs against employees and customers, including a Black customer, as alleged in paragraph 92.

204. J.C. Lewis knew of Welch's conduct and did not terminate him, as alleged in paragraph 93.

205. Mike Offer violated J.C. Lewis's own corporate fraternization policy by engaging in a romantic relationship with a subordinate under his influence, as alleged in paragraph 99; personally participated in and had knowledge of the manipulation of the Savannah dealership's operational books to suppress profit metrics, as alleged in paragraphs 45 and 250; and weaponized his executive authority to execute the very demotion that followed his own policy violation, as alleged in paragraph 39.

206. J.C. Lewis knew or should have known of Offer's fraternization policy violation, his access to and manipulation of the dealership's financial records, and his abuse of executive authority over Ward's compensation and career, yet continued to employ him in a position of substantial power over dealership personnel.

207. Stephen Staton and Patrick Kennedy engaged in an aggressive, hostile, and coordinated campaign of corporate duress designed to forcefully strip Ward of his contractually guaranteed compensation, culminating in an ultimatum that Ward sign a unilaterally reduced pay agreement or be fired immediately, as alleged in paragraphs 52 through 59.

208. J.C. Lewis knew or should have known of Staton's and Kennedy's coercive tactics toward Ward, yet took no corrective action and continued to vest them with supervisory authority over his compensation and continued employment.

209. Marjorie Solomon, the company's Human Resources and Compliance Manager, utilized her position to actively surveil Ward rather than investigate his complaints, to protect corporate wrongdoing by confirming she would report his protected complaint to the very leadership he was complaining about, and to facilitate his retaliatory termination within six days of that complaint, as alleged in paragraphs 73 through 82.

210. J.C. Lewis knew or should have known that Solomon was using the company's human-resources function to shield the company and retaliate against complainants rather than to remedy discrimination and protect employees.

211. J.C. Lewis failed to exercise ordinary care in hiring, retaining, training, and supervising Welch, Offer, Staton, and Solomon.

212. Ward was harmed as a result.

### COUNT XI. UNJUST ENRICHMENT (Pleaded in the Alternative to Count VIII)
*(Against J.C. Lewis Motor Company)*

213. Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 83, 86, and 87, as if fully set forth herein.

214. This count is pleaded in the alternative to Count VIII.

215. Ward generated more than $31 million in variable gross profit for J.C. Lewis and outperformed his peers in the dealership group, as alleged in paragraph 83.

216. J.C. Lewis accepted and retained the benefit of Ward's work.

217. J.C. Lewis paid Ward less than the reasonable value of his work, as alleged in paragraphs 86 and 87.

218. J.C. Lewis's retention of the benefit without paying its reasonable value is inequitable.

### COUNT XII. FAILURE TO PAY EARNED WAGES AND COMMISSIONS
*(Against J.C. Lewis Motor Company)*

219. Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 83, 85, and 86, as if fully set forth herein.

220. Ward earned a percent-base commission on commissionable gross under his pay plans, as alleged in paragraph 85.

221. The commissions Ward earned are calculable from J.C. Lewis's own records of the gross profit he generated, exceeding $31 million between August 2023 and March 2026, as alleged in paragraph 83.

222. Despite this documented performance, Ward never received more than $18,000 in any month as General Sales Manager, and J.C. Lewis did not pay Ward all of the commissions he earned, as alleged in paragraph 86.

223. Ward suffered a loss equal to the unpaid amounts.

### COUNT XIII. CONVERSION
*(Against J.C. Lewis Motor Company, Walter Lewis, and Stephen Staton)*

224. Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 87 through 90, as if fully set forth herein.

225. Ward had a right to specific, identifiable funds, namely the manufacturer incentives designated for payment to him, which he stopped receiving after his October 2024 return, as alleged in paragraphs 87 and 88.

226. J.C. Lewis received and retained those funds rather than paying them to Ward, as alleged in paragraph 89.

227. Ward demanded the funds, and J.C. Lewis refused to pay them, as alleged in paragraph 90.

228. The Defendants converted Ward's funds.

229. Ward suffered damages equal to the converted funds.

## COUNT XIV. CIVIL CONSPIRACY (Pleaded in the Alternative)
### *(Against Walter Lewis, Stephen Staton, Marjorie Solomon, and Mike Offer)*

230. Plaintiffs incorporate by reference paragraphs 1 through 26, and paragraphs 33, 35, 52 through 56, and 104, as if fully set forth herein.

231. This count is pleaded in the alternative, to the extent any individual Defendant acted outside the scope of his or her employment.

232. The individual Defendants agreed to a common plan to demote Ward, reduce Ward's salary, and force his termination because of his race, as alleged in paragraph 104.

233. Stephen Staton, Patrick Kennedy, and Julian Lewis further engaged in a coordinated campaign to coerce Ward into surrendering his guaranteed compensation, as alleged in paragraphs 52 through 56.

234. Mike Offer's romantic relationship with Jeana Burke, and the influence it gave him over the terms and conditions of Burke's and Ward's employment, was personal in nature and outside the legitimate scope of his corporate role, as alleged in paragraphs 33 and 35.

235. The individual Defendants committed the underlying torts and statutory violations alleged in Counts I, II, III, and IX.

236. Ward suffered damages as a result of the conspiracy.

## COUNT XV. FRAUD AND FRAUDULENT CONCEALMENT (O.C.G.A. § 51-6-2)
### *(Against J.C. Lewis Motor Company and Walter Lewis)*

237. Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, and paragraphs 8, 41, 81, 83, and 85 as if fully set forth herein.

### A. Who Committed the Fraud

238. Defendant Walter Lewis, the owner and president of J.C. Lewis Motor Company, personally directed the accounting practices described in this Count, as alleged in paragraph 8

239. J.C. Lewis Motor Company, acting through Walter Lewis, prepared and controlled the Savannah dealership's books and the profit figures derived from them.

### B. What Was Misrepresented

240. During his employment, Ward's compensation was calculated, in whole or in part, on profit figures derived from the Savannah dealership's books and internal accounting, including under base-commission pay plans described in paragraph 85.

241.    J.C. Lewis represented those profit figures to Ward through pay plans, pay statements, and accounting records.

242.    On the occasions when Ward reviewed the Savannah dealership's monthly balance sheets, Ward personally observed line-item charges that bore no relationship to the legitimate operational expenses of the dealership, including travel expenses and golf club charges.

243.    These charges were intentionally misclassified as local dealership operating expenses, which artificially reduced and distorted the dealership's reported net and commissionable gross profit figures.

244.    The dealership profit figures J.C. Lewis represented to Ward were therefore false, because they were artificially suppressed by expenses that were not legitimate costs of the dealership's operations.

245.    The artificial suppression of the mathematical base used to measure his compensation directly deprived him of earned wages.

## C. When and Where the Misrepresentations Occurred

246.    The false profit figures were represented to Ward periodically throughout his employment at the Savannah dealership, in each pay period in which his compensation was calculated on those figures, from his return to the company in October 2024, as alleged in paragraph 41, through his termination on March 25, 2026, as alleged in paragraph 81.

## D. How the Scheme Was Concealed

247.    On information and belief, J.C. Lewis charged personal executive expenses to the Savannah dealership's books throughout the period relevant to Ward's employment.

248.    The specific accounting entries, dollar amounts, and dates of those charges are recorded solely in J.C. Lewis's internal books and accounting systems, which are within J.C. Lewis's exclusive possession and control.

249.    J.C. Lewis always actively restricted and blocked Ward from such access (even when Ward was the General Sales Manager of the Savannah dealership, which was one of the highest positions at the dealership and largely responsible for operations and expenses).

250.    Defendants Lewis, Staton, and Offer all maintained unfettered executive access to these books and actively utilized their positions to shield the manipulated spreadsheets from Ward's view, thereby preventing him from discovering the true extent of his financial underpayment.

251.    Ward's white counterparts, who held comparable roles in seniority and responsibility, were granted routine, unrestricted access to the system to verify and inspect the expenses for their dealerships.

252.    Ward's present inability to plead the specific entries, amounts, and dates of each improperly charged expense results from J.C. Lewis's own exclusive control of the accounting records that would reveal them.

253. These allegations are based on the sworn account of James Eady and on the discrepancy between the more than $31 million in variable gross profit Ward generated, as alleged in paragraph 83, and the compensation J.C. Lewis paid him. Ex. A.

254. Defendants Lewis, Staton, and Offer knew the profit figures represented to Ward were false when they made them.

255. Defendants Lewis intended that Ward accept compensation calculated on the artificially suppressed profit.

256. Ward's present inability to plead the specific entries, amounts, and dates of each improperly charged expense results directly from J.C. Lewis's discriminatory policy of exclusive control and concealment. This targeted restriction left Ward with no independent means to verify the accuracy of the profit metrics used to calculate his pay, thereby heightening the concealment of the fraud. This Count nonetheless satisfies that heightened pleading requirement under Rule 9(b).

**E. Reliance and Resulting Harm**

257. Ward justifiably relied on J.C. Lewis's accounting representations, which were within the company's exclusive control and which Ward had no independent means to verify.

258. Ward relied on those representations by accepting the compensation calculated on them and continuing to perform his duties, generating more than $31 million in variable gross profit for J.C. Lewis, as alleged in paragraph 83.

259. Whether Ward's compensation was measured by gross profit, net profit, or any other figure derived from the dealership's books, the improperly charged personal expenses distorted that figure and reduced the compensation owed to him.

260. The compensation Ward earned exceeded the amounts J.C. Lewis paid him, in an amount to be established through an accounting of the dealership's books and proven at trial.

261. Ward is entitled to an accounting of the Savannah dealership's books and records to determine the full extent of the suppressed profit and the resulting unpaid compensation.

262. This conduct constitutes fraud and fraudulent concealment under O.C.G.A. § 51-6-2 and Georgia common law.

263. J.C. Lewis and Walter Lewis acted with the specific intent to cause Ward harm by depriving him of compensation he had earned.

264. Ward suffered damages as a result and is entitled to punitive damages, including punitive damages not subject to the cap of O.C.G.A. § 51-12-5.1(g), pursuant to O.C.G.A. § 51-12-5.1(f).

**COUNT XVI. DEFAMATION (SLANDER AND LIBEL PER SE) (O.C.G.A. §§ 51-5-1 and 51-5-4)**

*(Against J.C. Lewis Motor Company, Walter Lewis, and Stephen Staton)*

265. Plaintiff Justin Ward incorporates by reference paragraphs 1 through 26, as if fully set forth herein.

266. J.C. Lewis terminated Ward's employment on March 25, 2026.

267. After Ward's termination, Staton told J.C. Lewis employees that Ward had voluntarily quit his job.

268. Ward has worked in the automobile retail business in the Savannah community for many years and has built a long professional reputation there.

269. In the retail automobile industry, a manager who walks away from his team and his customers without notice is regarded as unreliable and unprofessional.

270. In addition, following Ward's termination, J.C. Lewis refused to do business with the dealership where Ward found subsequent employment.

271. By telling Ward's former subordinates and others that Ward voluntarily quit and by refusing to do business with the dealership where Ward now works, Staton conveyed that Ward had abandoned the employees and customers who depended on him and that other companies should not conduct business with Ward.

272. The statement that Ward quit was false, because J.C. Lewis terminated him.

273. Staton repeated the false statement to other persons inside and outside the company, including persons in the automobile retail industry.

274. The identity of each person to whom the statement was published, and the date of each publication, are within J.C. Lewis's knowledge and will be established through discovery.

275. Staton knew the statement was false, because he personally terminated Ward.

276. The false statement that Ward voluntarily quit and abandoned his position and J.C. Lewis's subsequent refusal to do business with Ward's current employer imputes to Ward a want of reliability, loyalty, and integrity in the conduct of his profession as a dealership sales executive, and holds him up to disgrace within his trade and community.

277. The actions were calculated to injure Ward in his trade and profession.

278. Under O.C.G.A. § 51-5-4(a)(3), spoken words that injure a person in his trade, office, or profession are slander per se, and damages are presumed.

279. To the extent any such statement was reduced to writing, it constitutes libel per se under O.C.G.A. § 51-5-1.

280. J.C. Lewis is liable for the statements of its leadership made within the scope of their employment.

281. The statements were not privileged; any conditional privilege was forfeited because the speaker knew the statement was false and acted with actual malice.

282. Ward's standing in the local automobile retail community is essential to his ability to obtain comparable employment, and the false statement has injured that standing.

283. Ward suffered injury to his professional reputation, humiliation, and other damages as a result.

284. The speaker acted with actual malice, entitling Ward to punitive damages.

## COUNT XVII. LOSS OF CONSORTIUM

*(Brought by Nikiya Ward against J.C. Lewis Motor Company, Walter Lewis, Stephen Staton, and Marjorie Solomon)*

285. Plaintiff Nikiya Ward incorporates by reference all prior paragraphs, as if fully set forth herein.

286. Nikiya Ward is married to Justin Ward, as alleged in paragraph 3.

287. The Defendants injured Justin Ward as alleged in this Complaint.

288. Ward was the historic breadwinner of the Ward household. Nikiya Ward lost the services, society, companionship, income, and consortium of her spouse as a result.

## COUNT XVIII. PUNITIVE DAMAGES

*(Against J.C. Lewis Motor Company, Walter Lewis, Stephen Staton, Marjorie Solomon, and Mike Offer)*

289. Plaintiffs incorporate by reference paragraphs 1 through 26, and paragraphs 76, 77, 81, 82, 104, and 109, as if fully set forth herein.

290. Walter Lewis personally acknowledged the pattern of removal of the company's Black executives in his own written email, as alleged in paragraphs 104 and 109.

291. J.C. Lewis physically surveilled Ward, restructured his sales team, and terminated him six days after his protected complaint, as alleged in paragraphs 76, 77, 81, and 82.

292. The Defendants acted with malice or reckless indifference to Ward's federally protected rights, supporting punitive damages under 42 U.S.C. § 1981.

293. The Defendants acted with that entire want of care that raises the presumption of conscious indifference to consequences, supporting punitive damages under O.C.G.A. § 51-12-5.1.

294. J.C. Lewis and Walter Lewis's fraud was undertaken with the specific intent to cause Ward harm, supporting an award of punitive damages not subject to the statutory cap under O.C.G.A. § 51-12-5.1(f), as alleged in paragraphs 254 through 263.

295. The Defendants published false statements about Ward with actual malice, further supporting an award of punitive damages.

## COUNT XIX. ATTORNEY'S FEES AND LITIGATION EXPENSES

*(Against J.C. Lewis Motor Company, Walter Lewis, Stephen Staton, Marjorie Solomon, and Mike Offer)*

296. Plaintiffs incorporate by reference paragraphs 1 through 26, as if fully set forth herein.

297. Ward is entitled to reasonable attorney's fees and costs as a prevailing party under 42 U.S.C. § 1988 and 29 U.S.C. § 2617.

298. The Defendants have acted in bad faith and have been stubbornly litigious, entitling Plaintiffs to litigation expenses under O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)    Enter judgment in Plaintiffs' favor on all Counts;

(b)    Award Justin Ward back pay, lost benefits, and prejudgment interest;

(c)    Award Justin Ward front pay or, in the alternative, reinstatement;

(d)    Award Justin Ward compensatory damages, including damages for emotional distress, without statutory cap under 42 U.S.C. § 1981;

(e)    Award Justin Ward the damages proven on his Georgia breach-of-contract, unpaid-wages, conversion, unjust-enrichment, fraud, and defamation claims;

(f)    Award Justin Ward his FMLA lost wages and benefits and an equal amount as liquidated damages under 29 U.S.C. § 2617;

(g)    Award Nikiya Ward damages for loss of consortium;

(h)    Award punitive damages under 42 U.S.C. § 1981 without statutory cap, under O.C.G.A. § 51-12-5.1 (including punitive damages not subject to the cap of § 51-12-5.1(g) for conduct undertaken with specific intent to cause harm), and the maximum damages available under Title VII;

(i)    Award Plaintiffs reasonable attorney's fees, litigation expenses, and costs under 42 U.S.C. § 1988, 29 U.S.C. § 2617, and O.C.G.A. § 13-6-11;

(j)    Order an accounting of the Savannah dealership's books and records to determine the compensation withheld from Justin Ward;

(k)    Award pre- and post-judgment interest as allowed by law; and

(l)    Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted this 1st day of July, 2026.

*/s/ Brandy Scott Mai*
Brandy Scott Mai
Ga. Bar No. 746703
Brandy Mai Law Firm, PC
101 Blue Moon Xing, Ste 3-249
Pooler, GA 31322
Phone: (910) 580-0380
brandy@brandymai.com

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

|  |  |
|---|---|
| **JUSTIN WARD** and **NIKIYA WARD**,<br>    Plaintiffs,<br><br>v.<br><br>**J.C. LEWIS MOTOR COMPANY;**<br>**WALTER LEWIS; STEPHEN**<br>**STATON; MARJORIE SOLOMON;**<br>and **MIKE OFFER,**<br>    Defendants. | CIVIL ACTION<br>FILE NO. _____<br><br>**JURY TRIAL DEMANDED** |

### VERIFICATION OF PLAINTIFF NIKIYA WARD

**STATE OF GEORGIA**
**COUNTY OF** _____

PERSONALLY APPEARED before the undersigned officer duly authorized to administer oaths, **NIKIYA WARD**, who, being first duly sworn, states that she is a Plaintiff in the above-styled action; that she has read the foregoing Complaint; and that the factual allegations within her personal knowledge, including those concerning her marriage to Justin Ward and her claim for loss of consortium, are true and correct to the best of her knowledge, information, and belief.

_____
**NIKIYA WARD**

Sworn to and subscribed before me
this \_\_\_\_1\_\_\_\_ day of \_\_\_July_____, 2026.

_____
Notary Public
My commission expires: 07/02/2029
*(NOTARY SEAL)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | |
|---|---|
| **JUSTIN WARD** and **NIKIYA WARD,**<br>     Plaintiffs, | |
| v. | CIVIL ACTION<br>FILE NO. _____ |
| **J.C. LEWIS MOTOR COMPANY;<br>WALTER LEWIS; STEPHEN<br>STATON; MARJORIE SOLOMON;**<br>and **MIKE OFFER,**<br>     Defendants. | **JURY TRIAL DEMANDED** |

**VERIFICATION OF PLAINTIFF JUSTIN WARD**

**STATE OF GEORGIA**
**COUNTY OF _____**

PERSONALLY APPEARED before the undersigned officer duly authorized to administer oaths, **JUSTIN WARD**, who, being first duly sworn, states that he is a Plaintiff in the above-styled action; that he has read the foregoing Complaint ;and that the factual allegations contained therein are true and correct to the best of his knowledge, information, and belief.

_____
                                                  **JUSTIN WARD**

Sworn to and subscribed before me
this ___1___ day of ___July___, 2026.

_____
Notary Public
My commission expires: 07/02/2029
*(NOTARY SEAL)*