**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

**Justin Ward** and **Nikiya Ward**,

Plaintiffs,

CIVIL ACTION FILE NO.
4:26-CV-00173-RSB-CLR

v.

**J.C. Lewis Motor Company; Walter Lewis; Stephen Staton; Marjorie Solomon;** and **Mike Offer**,

Defendants.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO STAY AND COMPEL ARBITRATION**

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Justin Ward spent nearly a decade with J.C. Lewis Motor Company before he was pushed out within days of raising concerns about race discrimination in the workplace and experiencing serious medical crises because of it. He and his wife, Nikiya Ward, bring this action under Title VII, 42 U.S.C. § 1981, and Georgia law for the discrimination, retaliation, wage suppression, and consortium injuries that followed. Rather than answer those claims, Defendants ask this Court to send Mr. Ward to arbitration under a clause buried on page 63 of a sixty-plus page onboarding packet, a clause the Company itself never signed.

Plaintiffs oppose that Motion and contend it should be denied for two independent reasons, either of which is sufficient on its own. First, Mr. Ward's employment falls within the class of workers Section 1 of the Federal Arbitration Act excludes from the Act altogether, so the statute Defendants invoke does not authorize this Court to compel anything. Second, even if the FAA applied, Defendants have not carried their burden to prove that an arbitration agreement

was ever formed. They offer no evidence of how mutual assent occurred, what procedure produced Mr. Ward's initial on the arbitration clause, or why the Company's own signature line is the one line in a sixty-plus page onboarding packet that the Company itself never executed. Every question that follows those two threshold defects, who decides, who may enforce, what the agreement covers, and whether it is enforceable, independently narrows or defeats the relief Defendants seek.

Section 1 withdraws from the Act "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. section 1. Mr. Ward's managerial duties required him to personally arrange, dispatch, and receive vehicles moving across state lines as a recurring, documented part of his job, not an incidental one. Ex. A-1 (Ward Aff.) ¶¶ 7-15. Defendants' Motion addresses only Section 2's interstate-commerce requirement; it never engages Section 1 at all. Doc. 12 at 6. A court must resolve that antecedent statutory question before reaching the Act's enforcement machinery, and the contract cannot answer it by its own say-so. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 111 (2019).

Even setting Section 1 aside, formation is Defendants' burden, and the record they submit does not carry it. Page 66 of their own exhibit is a mutual execution block: Mr. Ward signed the employee line while the Company's own designated "AGREED" line is blank. Doc. 12-1, Ex. A at 66. Every other acknowledgment captured in that onboarding session, including two full-signature pages in the same Guidebook, carries an identical, verifiable timestamp; the one mark the Motion most needs, Mr. Ward's initial on the arbitration clause itself, carries none. Doc. 12-1, Ex. A at 63, 66-67; Ex. 4. Defendants offer no declaration describing the platform's security procedures, no explanation of how or when that initial was captured, and no account of why the

Company's own signature never followed. A movant who cannot identify the distinct instant at which both parties actually assented has not proven formation under the standard this Court has already applied. *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016); *Sayers v. Activision Blizzard, Inc.*, No. 4:24-cv-00078-RSB-CLR, Doc. 156, slip op. at 13, 15-16 (S.D. Ga. Sept. 4, 2025).

Should the Court reach beyond these two threshold defects, each remaining question independently narrows or defeats the Motion: the Guidebook contains no delegation clause, so this Court, not an arbitrator, decides who may enforce the agreement, what it covers, and whether it is enforceable; the agreement by its own terms binds only the Company, not the four individual Defendants or Mrs. Ward; its coverage is prospective from October 2, 2024 and does not reach Count XVI's post-termination conduct toward third parties; and the Company's reservation of a unilateral right to revise the very provision it calls irrevocable, combined with the manner of its presentation, renders it unenforceable in any event. And because Plaintiffs request here a stay rather than dismissal, Section 3 becomes mandatory and *Smith v. Spizzirri* forecloses dismissal of any claim the Court does compel.

## II. STANDARD OF REVIEW

Although styled in part as a motion to dismiss, Defendants identify no Rule 12(b) ground independent of arbitration and expressly decline to seek adjudication of the Complaint's sufficiency. Doc. 12 at 1 n.2. The Motion therefore rises or falls on the arbitration questions alone.

This inquiry follows the three-part framework the Eleventh Circuit applies to any motion to compel arbitration: whether an arbitration agreement was formed, whether it "applies to the dispute at hand," and whether any "grounds as exist at law or in equity for the revocation of any

contract" invalidate it. *Attix v. Carrington Mortg. Servs.*, 35 F.4th 1284, 1294 (11th Cir. 2022); *see also Sayers v. Activision Blizzard, Inc.*, No. 4:24-cv-00078-RSB-CLR, slip op. at 9-10 (S.D. Ga. Sept. 4, 2025). Formation, the first prong, is addressed in Question Two; the grounds to invalidate an otherwise-formed agreement, the third prong, in Question Six; and whether the agreement applies to the dispute, the second prong, in Question Five. Before any of those, the Court must first determine what statute authorizes compulsion at all (Question One) and, once formation is resolved, who decides the questions that remain (Question Three), the principal respect in which this case departs from *Sayers*, where an express delegation clause sent the remaining questions to the arbitrator, *id.* at 10-14; the Guidebook here contains no comparable clause. Doc. 12-1, Ex. A at 62-63.

Because the Motion seeks relief under the FAA, the Court may consider the arbitration document and evidence outside the pleadings, and the party seeking to compel bears the burden of proving the agreement's existence and terms. *Bazemore v. Jefferson Capital Systems, LLC*, 827 F.3d 1325, 1329-33 (11th Cir. 2016). The formation inquiry is "summary judgment-like": the Court views the evidence in the nonmovant's favor, and a genuine dispute over the making of the agreement requires a Section 4 trial. *Id.* at 1333; 9 U.S.C. section 4; *see also Bess v. Check Express*, 294 F.3d 1298, 1304 (11th Cir. 2002). The presumption favoring arbitration governs scope; it does not resolve whether an agreement was formed at all, and Georgia law, not a federal presumption, governs who may invoke a non-signatory's obligations. *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287, 299-303 (2010); *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009). In assessing scope, the Court looks to the Complaint's factual allegations rather than its legal labels, *Gregory v. Electro-Mechanical Corp.*, 83 F.3d

382, 384 (11th Cir. 1996), and Plaintiffs recite those allegations below as pleaded, not as adjudicated facts.

## III. SECTION 1 EXCLUSION

Before reaching formation, who decides, who may enforce, scope, or enforceability, the Court must first identify what statute authorizes compulsion. Two statutes could supply that authority: the Federal Arbitration Act, and, if the FAA does not apply, the Georgia Arbitration Code, which the policy names as its own fallback. Neither authorizes compulsion here.

### *A. Mr. Ward Belongs to a Class of Workers Section 1 Excludes from the FAA.*

While Defendants contend that Mr. Ward's employment directly affected and involved interstate commerce and invoke that showing under FAA Section 2, they put forth no analysis of whether his employment falls within Section 1's exclusion. Doc. 12 at 6. Section 1 excludes "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. section 1. Under *Southwest Airlines Co. v. Saxon*, the class must be defined by the work its members typically perform, not by Mr. Ward's title or by the dealership's business generally. 596 U.S. 450, 455-58 (2022). The class properly defined here is dealership personnel who regularly arrange, prepare, dispatch, document, and receive vehicle transfers between dealerships in different States, a class narrower than the dealership's workforce as a whole and broader than Mr. Ward alone.

Dealer trades were a recurring part of that class's managerial work, occurring typically multiple times per month, with a substantial portion involving Ford dealerships in other States, and each required physical transportation of a vehicle across state lines. Ex. A-1 (Ward Aff.) ¶¶ 7-9. For each trade, Mr. Ward personally located the vehicle through Ford's Vehicle Locator system and contacted the counterpart dealership; personally prepared or directed the vehicle's

preparation for transport; personally arranged and dispatched interstate transportation; and, on arrival, personally inspected and drove the vehicle from the unloading point or directed staff to do so. *Id.* ¶¶ 10-14. These duties were regular and recurring since 2022, increasing during COVID-era shortages, *id.* ¶ 15, and were carried out in accordance with ordinary practice at the Company and at Ford generally, not as a duty unique to Mr. Ward. *Id.* ¶ 16. He was a W-2 employee throughout. Ex. A-2 (W-2). *Saxon* asks whether the class's work plays a "direct and necessary role in the free flow of goods" across state lines, not merely whether the class works in an industry touching interstate commerce generally, 596 U.S. at 458, and the preparation, dispatch, and receipt duties above satisfy that standard directly.

Section 1 focuses on the performance of work by the exempted employee, not the character of the employer's business, and the worker need not be employed by a transportation company. *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 252-56 (2024). Nor must a worker cross state lines himself, and Section 1 does not turn on whether the worker personally rides with a vehicle that does. *Flowers Foods, Inc. v. Brock*, 608 U.S. ___, No. 24-935, slip op. at 3 (May 28, 2026) ("We have already held in *Saxon* that §1 does not require workers to cross state lines. Nor, we now add, does §1 turn on a game of tag with vehicles that do."). Mr. Ward's preparation, dispatch, and receipt of vehicles moving between Georgia and out-of-state dealerships are exactly the loading, unloading, and final-leg functions *Brock* and *Saxon* treat as transportation work.

*Brock* separately notes, without resolving, that a worker's title to the goods handled or performance through an independently owned business might be relevant elsewhere; neither consideration weighs against Mr. Ward, as he was a W-2 employee throughout, not an independent contractor, and the vehicles belonged to the dealerships, not to him. 608 U.S. ___,

slip op. at 8; Ex. A-2 (W-2). Defendants' commerce showing answers only the FAA's separate, undisputed Section 2 requirement; it does not answer the Section 1 worker-class question, and *Bissonnette* makes that distinction dispositive, 601 U.S. at 252-56, while *New Prime* treats Section 1 as an antecedent sequencing rule the Court must resolve before invoking the Act's enforcement provisions. 586 U.S. at 111. If the Court concludes the present record is insufficient to resolve Section 1 on the papers, Plaintiffs request narrowly confined discovery, or in the alternative an evidentiary hearing, before ruling on the exclusion; the relevant materials are within the Company's own possession and control. *Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1352-53 (11th Cir. 2021).

***B. The Georgia Arbitration Code Supplies No Alternative Route.***

Assuming *arguendo* that the parties formed an agreement, the instrument selects its own fallback: "If it is determined that the Federal Arbitration Act does not apply, then the arbitration agreement shall be enforced under the Georgia Arbitration Act." Doc. 12-1, Ex. A at 62. If no agreement was formed, the fallback clause binds no one and the analysis ends at Question Two in any event.

The Code does not reach this clause. It does not apply to "[a]ny contract relating to terms and conditions of employment unless the clause agreeing to arbitrate is initialed by all signatories at the time of the execution of the agreement," O.C.G.A. section 9-9-2(c)(9), and, being in derogation of the common law, is strictly construed. *Progressive Data Systems, Inc. v. Jefferson Randolph Corp.*, 275 Ga. 420, 421, 568 S.E.2d 474, 475 (2002). Georgia applies that principle literally: initialing every page and signing the last page of an employment contract does not satisfy the statute, because "[s]ubsection (c)(9) specifically requires that the arbitration clause be initialed, not the bottom of the pages on which the clause appears." *Vasudeva v. Dagnew*, 361

Ga. App. 244, 247, 862 S.E.2d 326, 329 (2021); *accord Columbus Anesthesia Group, P.C. v. Kutzner*, 218 Ga. App. 51, 53-54, 459 S.E.2d 422, 424 (1995). Here, only Mr. Ward initialed; no Company representative initialed the arbitration clause, and the Company's designated agreement line at page 66 is blank. Doc. 12-1, Ex. A at 63, 66.

Preemption does not rescue the provision. Georgia courts hold subsection (c)(9) preempted where the FAA applies, *Davidson v. A.G. Edwards & Sons, Inc.*, 324 Ga. App. 172, 175, 748 S.E.2d 300, 304 (2013); *cf. Langfitt v. Jackson*, 284 Ga. App. 628, 635, 644 S.E.2d 460, 466 (2007) (subsection (c)(8)), but this branch is reached only if the FAA does not apply, and *Kutzner* confirms the corollary: where the FAA was unavailable, the court enforced subsection (c)(9) on its terms. 218 Ga. App. at 53-54, 459 S.E.2d at 424. Defendants cannot avoid both consequences by characterizing the Company's role inconsistently: page 63 makes the agreement binding on "the Company and me," and page 66 supplies the Company an "AGREED" line. Doc. 12-1, Ex. A at 63, 66. If the Company was a contemplated signatory, subsection (c)(9) is unsatisfied and the Georgia Code affords no route to compulsion; if Defendants instead contend the Company was never a contemplated signatory, they cannot at the same time rely on page 63's bilateral language and page 66's employer "AGREED" line to supply the mutual assent Question Two addresses. Because Section 1 removes this contract from the FAA, and the Georgia Code does not reach a clause the employer never initialed, no statute authorizes compulsion, and the Motion fails at the threshold.

## IV. FORMATION

If the Court agrees that no statute authorizes compulsion, the inquiry ends at Question One. If a statute applies, Defendants must still prove the parties formed an agreement under ordinary principles of Georgia contract law, which govern regardless of which statute ultimately

applies. Georgia law requires "the assent of the parties to the terms of the contract." O.C.G.A. section 13-3-1. This question lies outside the pro-arbitration presumption. *Granite Rock*, 561 U.S. at 299-303.

***A. The Document's Own Structure Made the Company's Signature a Condition of the Arbitration Promise's Effectiveness.***

The controlling fact is visible on the face of Defendants' own exhibit. The Company designed page 66 as a mutual execution block, Mr. Ward signed the employee line, and the line immediately below it, reading "AGREED: For J.C. LEWIS MOTOR COMPANY," is blank. Doc. 12-1, Ex. A at 66. Georgia law does not treat every unsigned instrument as unenforceable, since a writing may still bind the parties where their conduct demonstrates mutual assent, "inferred from a performance under the contract." *Brown v. Morgan & Morgan Atlanta, PLLC*, 373 Ga. App. 459, ___, 908 S.E.2d 727, ___ (2026). The question is accordingly not whether an unsigned line is categorically fatal, but whether *this* document objectively made the Company's own signature a condition of the arbitration promise's effectiveness, such that no comparable performance-based substitute was contemplated.

That design was deliberate and selective, and it answers the question. Page 63 does not merely describe an obligation; it makes the arbitration promise "binding and irrevocable for the Company and me as written, unless mutually revoked in a written agreement signed by both parties," expressly tying the promise's own irrevocability to a bilateral signed writing. Doc. 12-1, Ex. A at 63. The Guidebook elsewhere calls for Mr. Ward's signature or initials alone, on the Arbitration Acknowledgment at page 63 and the Employee Guidebook Acknowledgment at page 67, with no corresponding Company line on either. *Id.* at 63, 67. The Company thus knew how to draft, and did draft, both a unilateral acknowledgment format and a distinct bilateral execution format, and it chose the bilateral format for the very page affirming Mr. Ward's understanding of

the Agreement to Arbitrate. *Id.* at 65-66. Unlike *Brown*, where nothing in the writing conditioned effectiveness on a signature, this instrument's own text ties the promise's binding, irrevocable character to a bilateral signed writing the Company never produced. Having built that mechanism, the Company cannot now treat its own blank line as immaterial, and Mr. Ward's continued employment cannot substitute for the specific execution mechanism the document itself describes.

Where the drafter builds a document for signature by both sides and only one side signs, the document shows on its face that the other did not manifest assent through the mechanism it specified. *Cf. Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 689-90 (5th Cir. 2018) (employer's failure to sign a mutual execution block defeated formation notwithstanding its drafting, retention, and later motion to compel). Georgia's Uniform Electronic Transactions Act reinforces the point where assent is said to arise from an electronic workflow: an electronic signature is attributable to a person only if it "was the act of the person," which may be shown by the efficacy of any security procedure and the surrounding circumstances. O.C.G.A. section 10-12-9. The record reflects a timestamped electronic act by Mr. Ward and no corresponding act by anyone at the Company. Plaintiffs do not rest on a separate contention that Mr. Ward did not know he was agreeing to arbitrate; that presumption is addressed in Question Six below. The formation argument here rests on the objective, textual condition the document itself imposed.

***B. Caley Does Not Fit This Record.***

Anticipating that the blank Company line would be raised against them, Defendants argue in advance that no signature was required at all, invoking *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359 (11th Cir. 2005). Doc. 12 at 6-9. *Caley* turned on a document built to operate without signatures: Gulfstream's policy expressly provided that "NO signature shall be

required for the policy to be applicable," announced the policy in advance, and designated continued employment as the acceptance mechanism. *Id.* at 1362-64, 1369. The Guidebook says none of that; it contains a dedicated employer signature line, and page 63 speaks in bilateral terms, binding "the Company and me" and irrevocable absent "a written agreement signed by both parties." Doc. 12-1, Ex. A at 63, 66. To hold the blank line immaterial would erase a drafting choice *Caley* did not confront. *Brown v. Morgan & Morgan Atlanta* does not rescue Defendants' position either: it holds that performance *can* supply assent where the writing does not itself condition effectiveness on a signature, not that performance always displaces a signature mechanism the document expressly describes.

***C. The Surrounding Evidence Confirms the Gap.***

Georgia treats a missing contemplated signature as evidence that assent did not occur. *TranSouth Financial Corp. v. Rooks*, 269 Ga. App. 321, 323-24, 604 S.E.2d 562, 564-65 (2004) (affirming denial of arbitration where the proponent could not show the agreement became effective, emphasizing the absent signatures and lack of objective evidence of acceptance). Defendants' evidence does not close the gap here: counsel's declaration, Doc. 12-2, Ex. B, addresses only the parties' July 2026 pre-suit communications, identifies no representative who assented to the Guidebook, and does not explain why the "AGREED" line is blank or point to any electronic act attributable to the Company. Mr. Ward's continued work may establish his acceptance of employment, but unlike the policy in *Caley*, this instrument nowhere states that continued work substitutes for the Company's designated execution.

The onboarding record's own metadata compounds this gap. Every signature captured elsewhere in the same onboarding session, including both full-signature acknowledgments in the Guidebook itself, is stamped "Justin Ward (Oct 2, 2024 10:52 EDT)." Doc. 12-1, Ex. A at 66-67;

Ex. 4. The one execution the Company most needs to prove, Mr. Ward's initial on the Arbitration Acknowledgement, carries no timestamp, no security-procedure identifier, and no indication of how or when it was affixed. Doc. 12-1, Ex. A at 63; Ex. 4. Courts confronting comparable gaps decline to compel arbitration absent evidence of the platform's security procedures or a comparison to the reliability indicia on other same-day documents. *See Garcia v. Stoneledge Furniture LLC*, 102 Cal. App. 5th 41, 54 (2024); *Chen v. Premier Fin. All., Inc.*, No. 18-cv-3771, 2019 WL 316724 (N.D. Cal. Jan. 22, 2019). An unexplained assertion that an electronic act occurred does not satisfy the movant's burden to prove, by a preponderance of the evidence, that a specific agreement was actually and reliably formed. *Bazemore*, 827 F.3d at 1329-31. The absence of any explanation for why the one execution central to this Motion is the one the record cannot verify is a gap of the Company's own making, and it is the Company's burden to close.

This gap is dispositive under the very formation standard this Court has already applied. To prove formation, a movant must establish both "(a) a meeting of the minds (b) on the essential terms of the contract," and it is not enough to offer, as this record does, an amalgam of candidates for that showing without pinpointing a distinct instant at which both elements were present. *Bazemore*, 827 F.3d at 1329; *Sayers v. Activision Blizzard, Inc.*, No. 4:24-cv-00078-RSB-CLR, Doc. 156, slip op. at 13, 15-16 (S.D. Ga. Sept. 4, 2025). This Court has already held that a movant's declaration will suffice only where the declarant has personal knowledge of, and states the actual procedure by which, the specific party assented, *id.* at 14 (discussing *Hanson v. Experian Information Solutions, Inc.*, No. 1:23-CV-4564, 2024 WL 3509482, at *2, *4-6 (N.D. Ga. July 22, 2024), a Northern District of Georgia decision sustaining formation where the movant's declarant stated that he had personal knowledge of the relevant matters and provided

the basis for that personal knowledge), and that a movant's reliance on an amalgam of candidates for a "meeting of the minds" and "essential terms," without pinpointing the distinct instant at which both were present, does not carry the movant's burden. *Id.* at 15-16.

Defendants cannot make that showing here, and the record affirmatively defeats it. The one mark in the entire onboarding packet that could supply the "distinct instant" of Mr. Ward's own assent to arbitration specifically, his initial on the Arbitration Acknowledgement, is the only mark in the packet that carries no timestamp, no security-procedure identifier, and no indication of how or when it was affixed. Doc. 12-1, Ex. A at 63; Ex. 4. Defendants are left to point to the surrounding, differently timestamped marks on other documents in the same packet as a substitute, precisely the kind of undifferentiated amalgam of candidate assent-events this Court has already held insufficient as to three of the four theories of assent it considered. And even if Mr. Ward's own instant of assent could be pieced together from that surrounding record, no comparable showing exists for the Company's side of the transaction at all: the Company's own designated line is blank, so there is no candidate instant, however imprecise, at which a Company representative assented. Unlike the movant in *Sayers*, who ultimately prevailed on a fourth, distinct theory grounded in a specific, personally-attested update-and-acceptance mechanism, Defendants here offer no comparable fourth theory, and none is available on this record: the one signature the Motion needs is the one the record cannot verify. *Id.* at 19-20 (citing *Bazemore*, 827 F.3d at 1323). Defendants' formation showing accordingly fails a standard this Court has already applied. Should Defendants submit new evidence of an authorized Company act, or new evidence explaining the platform's timestamp practices, for the first time with their reply, Plaintiffs respectfully request leave to file a short surreply or, in the alternative, that the question be resolved at a hearing under Section 4.

***D. At Minimum, Formation Must Be Tried.***

The Court need not hold that the blank line defeats formation as a matter of law to deny the Motion. Plaintiffs' primary position is that the undisputed execution record entitles them to denial; in the alternative, the conflicting objective evidence creates a genuine dispute over mutual assent, and the remedy under Section 4 and *Bazemore* is a trial limited to formation, not an order compelling arbitration, with any preceding discovery confined to formation. 9 U.S.C. section 4; *Bazemore*, 827 F.3d at 1333. Where a party denies having signed the arbitration provision itself, Section 4 secures a statutory right to have that dispute tried, by jury if timely and specifically demanded. *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1345-48 (11th Cir. 2017) (the demand must be directed to the arbitrability issue specifically; a general Rule 38 demand on the underlying claims does not preserve it). Plaintiffs accordingly request that, should the Court find a genuine formation dispute rather than deny the Motion outright, any Section 4 trial be conducted before a jury, and will make a specific, issue-directed demand to that effect.

## V. WHO DECIDES

If the Court agrees that no agreement was formed, the inquiry ends at Question Two. If an agreement was formed, the Court must next decide who resolves the questions that remain. Enforcement and scope belong to the Court, not an arbitrator, unless the parties clearly and unmistakably delegated them. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-70 (2010).

The Guidebook contains no delegation clause. It does not state that the arbitrator, rather than a court, will decide questions of scope or enforceability, and it incorporates no administrator's rules that might themselves supply one. Doc. 12-1, Ex. A at 62-63. This is the principal respect in which *Sayers* does not control the remainder of this Motion: there, an express

delegation clause led the Court to ask only whether the plaintiff's challenges (bargaining power, expense, meaningful choice) were delegation-specific, and because they applied equally to the whole agreement, the Court sent scope and enforceability to the arbitrator. *Sayers*, slip op. at 10-14. That sequence has no analogue where there is no delegation clause to test in the first place; *Sayers*'s silence on non-signatory enforcement and temporal scope reflects only that those questions were not presented there, not that this Court lacks authority to decide them now.

Accordingly, this Court itself must resolve which parties may enforce the agreement (Question Four), which claims it reaches (Question Five), and whether it is enforceable (Question Six), a longer inquiry that follows from the contract's own language, not from any departure from *Sayers* or *Attix*. The Georgia Supreme Court has likewise confirmed, in the closely related non-signatory context of Question Four, that a trial court resolves such arbitrability questions *de novo* rather than deferring to an arbitrator's own view of its jurisdiction. *Jackson v. Stevenson*, No. S25G0922, 2026 Ga. LEXIS 146 (Ga. May 19, 2026).

## VI. WHO'S BOUND

If this Court, not an arbitrator, decides the remaining questions, it must next determine who may enforce the agreement. "[i]t goes without saying that a contract cannot bind a nonparty." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). Defendants' Motion treats the Company and four individuals, three current employees and one former employee, as interchangeable, identifies no basis on which any individual may enforce a document he or she never signed, and performs no defendant-by-defendant analysis.

### *A. The Promise Mr. Ward Actually Signed Runs to the Company.*

The text confirms the limit. The Agreement to Arbitrate that Mr. Ward initialed covers disputes "between me and the Company." Doc. 12-1, Ex. A at 63. Defendants will point to page

62, which describes covered claims as disputes "between an employee and the Company (or its owners, directors, officers, managers, employees, or agents)." *Id.* at 62. The two pages must be reconciled, not conflated: page 62's parenthetical describes the universe of claims covered when the Company is charged with its agents' acts; it does not, on its face, grant each of those individuals an independent right to compel Mr. Ward to arbitrate a claim against that individual personally, any more than incorporation by reference ordinarily enlarges the set of parties to a personal promise rather than drawing in the referenced document's operative mechanics. Whether page 62 nonetheless creates independent, enforceable rights in these individuals is a question of Georgia non-signatory law, addressed in Part B below.

***B. Georgia Law Governs Whether a Non-Signatory May Enforce the Agreement.***

State-law doctrines may permit enforcement by agents, intended beneficiaries, alter egos, or estopped non-signatories, but the party invoking one bears the burden, and state contract law, not federal common law, supplies the rule. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009). Georgia recognizes only a limited set, assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary, waiver, and estoppel, and rejects any broader "inherently intertwined" theory. *Jackson v. Stevenson*, No. S25G0922, 2026 Ga. LEXIS 146, at *[X] (Ga. May 19, 2026). Defendants' Motion attempts no showing under any of these for any individual Defendant, Doc. 12 at 6-13, and none applies: none is alleged to have assumed the Guidebook's obligations or is a corporate entity whose separateness is at issue, and no other document Mr. Ward signed incorporates its terms. Third-party beneficiary status fails because page 62 merely describes claims covered against the Company, and Georgia requires a clear intention to confer an independent, directly enforceable benefit, O.C.G.A. section 9-2-20(b);

*Southeast Grading, LLC v. City of Atlanta*, 359 Ga. App. 484, 488, 859 S.E.2d 116, 120 (2021); and agency fares no better, as each Defendant is sued for his or her own conduct.

That leaves equitable estoppel, which Georgia recognizes only where the signatory's claims rely on or seek to enforce the contract containing the clause, or where the signatory alleges substantially interdependent and concerted misconduct between the non-signatory and a party to the contract. *Jackson*, 2026 Ga. LEXIS 146, at *[X]; *accord Chemaly v. Lampert*, No. 24-10797, slip op. at 19-20 (11th Cir. Apr. 22, 2026). Neither route helps: none of Mr. Ward's claims, arising under Title VII, Section 1981, and Georgia wage-and-hour and tort law, relies on or seeks to enforce any Guidebook term, and he does not allege interdependent, concerted misconduct between any individual Defendant and the Company. Count XIV, the only count pleading a coordinated scheme, names only the four individuals, not the Company, Compl. at 15 (Count XIV caption), so estoppel fails as to Count XIV and, for the same reason, every other count.

***C. Enforcement Fails Defendant by Defendant and Count by Count.***

Defendants' Motion treats all five Defendants as a single unit and identifies no authority permitting any individual to compel arbitration of claims against him or her, a showing that is theirs to make and that they have not made. The fraud and accounting counts against Mr. Lewis present a closer question, and the Court should at minimum require a proper showing before compelling anything as to those.

Walter Lewis is the Company's owner and president; Stephen Staton served as Group General Manager; Marjorie Solomon served as Human Resources and Compliance Manager; and Mike Offer is a former Group General Manager no longer employed by the Company. Compl. ¶¶ 8, 10, 12, 14. None of the four signed or initialed any portion of the Employee Guidebook. Doc.

12-1, Ex. A at 63, 66. Applying the doctrines identified in Part B above, defendant by defendant and count by count, yields the table below.

***D. Mrs. Ward's Consortium Claim Follows the Disposition of the Underlying Claims.***

Nikiya Ward did not sign the agreement. Doc. 12-1, Ex. A at 66; Compl. ¶¶ 285-288. A Georgia consortium claim "is entirely dependent upon" the injured spouse's claim "and stands or falls with it," and *Lankford* compelled a non-signatory spouse to arbitrate where the underlying claim was itself arbitrable. *Lankford v. Orkin Exterminating Co.*, 266 Ga. App. 228, 229, 597 S.E.2d 470, 472 (2004). Two limits apply. First, the *Lankford* non-signatories were bound because they had accepted benefits and made payments under the contract, ratifying it; Mrs. Ward accepted no benefit and made no payment under the Guidebook, so that premise is absent. Second, the rule applies only where the underlying claim is itself arbitrable; if the Court finds no authorizing statute, no formed agreement, non-arbitrable claims, or an unenforceable provision, no arbitrable claim remains for Count XVII to follow, and it stays in this Court, and only to the same extent Mr. Ward's claims are actually compelled. This does not apply to a non-signatory spouse's own independent statutory claim, *cf. Lubin v. Starbucks Corp.*, 122 F.4th 1314, 1320-23 (11th Cir. 2024), but Count XVII is expressly pleaded as derivative, so *Lankford* supplies the governing framework, subject to the two limits above.

## VII. SCOPE

If no individual Defendant may enforce the agreement, the inquiry ends at Question Four as to those Defendants. As to the Company, the Court must examine each claim rather than compel the Complaint wholesale. *KPMG LLP v. Cocchi*, 565 U.S. 18, 22 (2011) (per curiam). The matrix in Part C below organizes that inquiry by defendant, operative conduct, timing relative to the October 2, 2024 execution date, and the provision's own language.

***A. Defendants Have Not Shown the Agreement Reaches Conduct Predating October 2, 2024.***

The agreement provides that covered disputes "will be resolved" through arbitration and became binding at the October 2, 2024 onboarding; it says nothing about "past, present, or future" disputes and does not run from Mr. Ward's original 2018 hire date. Doc. 12-1, Ex. A at 62-63, 66. The question for each count is not whether it involves facts predating execution, but whether the dispute itself, its accrual, arose before October 2, 2024, as distinct from a claim that accrues later but draws on earlier conduct as background. The Complaint pleads material pre-execution conduct, including the earlier constructive discharge and Mike Offer's conduct. Compl. ¶¶ 37-48. Defendants answer only that the claims arose ""during employment," Doc. 12 at 11-12, a formulation that ignores the execution date and does not distinguish claims that accrued before October 2, 2024 from those that accrued after but rely on earlier conduct as evidence. A scope presumption cannot supply temporal language the drafter omitted, and Defendants' authorities do not fill that gap: *Waffle House, Inc. v. Pavesi* addressed relational scope under a broad clause and a post-execution tort, not whether a later agreement reaches earlier events, 343 Ga. App. 102, 103-09, 806 S.E.2d 204, 206-10 (2017), and *Wedemeyer* addressed post-termination claims under a policy expressly applying to former employees. 324 Ga. App. 47, 48-52, 749 S.E.2d 241, 243-46 (2013).

***B. Count XVI Alleges Post-Termination Conduct Directed at Third Parties.***

The policy covers claims arising from employment, termination, or the work relationship, and excludes claims unrelated to it. Doc. 12-1, Ex. A at 62-63. Count XVI alleges that, after the March 25, 2026 termination, Stephen Staton told Company employees and industry contacts that Mr. Ward had voluntarily quit, and that the Company then refused to do business with the dealership where he found new employment. Compl. ¶¶ 265-284. *Wedemeyer* compelled post-termination defamation claims where Georgia requires only a slight causal connection to

employment and the statements followed a workplace incident, but the Gulfstream policy there expressly applied to former employees; this one does not. 324 Ga. App. at 48-52, 749 S.E.2d at 243-46. And Count XVI's two components differ: the false account of how employment ended is a closer question, but the later refusal to deal with a different employer is not a dispute about the terms of Mr. Ward's employment at all, it alleges injury to his standing in the industry and to a new commercial relationship, exactly the conduct the policy's exclusion addresses. If the components diverge, the order should say so.

***C. Count-by-Count Scope Matrix.***

The matrix below applies the accrual analysis above to every count, keyed to the paragraphs each count incorporates, to assist the Court in entering a claim-specific order under *KPMG* rather than an all-or-nothing ruling. Two groups deserve particular attention. Counts XI and XII plead a pay-suppression period from August 2023 through March 2026, Compl. ¶ 83, and the Complaint treats each pay period as a separate unlawful practice, *id.* ¶¶ 150-151, so pay periods before October 2, 2024 accrued, if at all, before the agreement existed, while later ones do not. Counts I, IV, X, and XIV blend pre-execution background with independently supporting post-execution conduct; Defendants bear the burden of showing the 2024 conduct is not itself an independently accrued, pre-execution dispute before any portion of those counts is compelled. They have not done that.

| Count(s) | Defendant(s) | Operative Conduct (Compl. ¶¶) | Accrual | Contractual Nexus |
|---|---|---|---|---|
| II, III, V-IX, XIII | Company, and individually named Defendants per count | Post-execution conduct only: Mar. 19-25, 2026 HR meeting, retaliation, FMLA, and IIED (¶¶58-82, 92-109); Mar. 2026 breach of salary guarantee (¶¶44-48, 61-62); post-Oct. 2024 incentive conversion (¶¶87-90). | Post-Oct. 2, 2024 | Within scope. |

| Count(s) | Defendant(s) | Operative Conduct (Compl. ¶¶) | Accrual | Contractual Nexus |
|---|---|---|---|---|
| I | Company, W. Lewis, Staton, Offer | 1981 race discrimination: 2024 demotion (¶¶37-38, background) through 2026 pay cut and termination (¶¶52-56, 61, 81, 91-109). | Continuing, culminating Mar. 25, 2026 | Within scope as to 2025-26 conduct; the 2024 demotion component is a closer question — see note above. |
| IV | Company only | Title VII race discrimination: same 2018-2026 history as Count I (¶¶28-32, 37-38, 52-59, 61, 78, 81, 91-109). | Continuing, culminating Mar. 25, 2026 | Same mixed analysis as Count I. |
| X | Company only | Negligent hiring/retention/supervision: Welch's conduct (undated, ongoing), Offer's 2022-24 conduct (¶¶45, 99, 250), 2025-26 coercion and HR failures (¶¶52-59, 73-82). | Mixed — pre- and post-execution | Mixed. Pre-Oct. 2024 retention decisions are a closer question; 2025-26 supervision failures are within scope. |
| XI-XII | Company only (XI alt. to VIII) | Unjust enrichment and unpaid wages/commissions: wage suppression Aug. 2023-Mar. 2026 (¶¶83, 85-87). | Periodic, pay-period by pay-period | Split: pay periods before Oct. 2, 2024 accrued before execution and are outside scope; later pay periods are within scope. |
| XIV | W. Lewis, Staton, Solomon, Offer (alt.) | Civil conspiracy: Offer/Burke relationship (pre-2024, ¶¶33, 35) and 2025-26 coercion campaign (¶¶52-56, 104). | Mixed | Pre-2024 portion is a closer question; 2025-26 portion within scope only if an individual Defendant may enforce, which Question Four rejects for all four. |
| XV | Company, W. Lewis | Fraud: false profit representations "periodically throughout his employment ... from his return ... in October 2024 ... through his termination" (¶246). | Periodic, Oct. 2024-Mar. 2026 | Within scope as pled — tied to the post-execution employment period. |
| XVI | Company, W. Lewis, Staton | Defamation: (1) false account of how employment ended; (2) refusal to deal with Mr. Ward's new employer and statements to industry contacts (¶¶265-284). | After Mar. 25, 2026 termination | Component (1): arguably within scope. Component (2): outside scope under the policy's exclusion for claims unrelated to employment. |
| XVII-XIX | Company, W. Lewis, Staton, Solomon (XVII); all five (XVIII-XIX) | Consortium (¶¶285-288); punitive damages and fees (¶¶289-298) — all derivative counts. | Derivative | Each follows the disposition of the underlying claim(s) to |

| Count(s) | Defendant(s) | Operative Conduct (Compl. ¶¶) | Accrual | Contractual Nexus |
|---|---|---|---|---|
| | | | | which it attaches; see Question Four, Part D. |

***D. Any Order Should Identify the Arbitrable Claims and Preserve the Remainder.***

Partial arbitrability is not a reason to enlarge the agreement; the FAA requires enforcement according to the parties' consent even where that produces parallel proceedings, *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217-21 (1985), and Plaintiffs acknowledge that genuinely covered claims must be compelled. But the possibility that some Company-centered claims are arbitrable does not justify sending pre-execution claims, individual-Defendant claims, or Count XVI's second component to the same forum. Nor is a stay of the claims that remain automatic: courts "generally refuse to stay proceedings of nonarbitrable claims when it is feasible to proceed with the litigation," *Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004), and any such request should turn on demonstrated factual overlap and prejudice, not an assumption that every count travels together.

## VIII. ENFORCEABILITY

As to any claim the Court finds outside scope, the inquiry ends at Question Five. As to any claim within scope, it is arbitrable only if the provision is also enforceable, and it is not: the Company reserved the power to revise the very provision it now seeks to enforce, and the manner of its presentation to Mr. Ward compounds that defect. Both challenges are directed at the arbitration provision itself, not the Guidebook as a whole, so they are for this Court, not an arbitrator, to decide. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444-46 (2006).

***A. The Company Reserved the Power to Revise the Very Provision It Now Seeks to Enforce.***

Page 63 makes the arbitration policy "binding and irrevocable for the Company and me as written, unless mutually revoked in a written agreement signed by both parties." Doc. 12-1,

Ex. A at 63. Page 67 reserves to the Company the right to "change, revise, or deviate from all or any portion of this Guidebook," excepting only at-will status, "without advance notice, at any time" and "in its sole determination." *Id.* at 67.

Defendants will invoke the canon that the specific controls the general, and that canon favors Plaintiffs: page 63's specific promise of irrevocability absent a signed bilateral writing should control over page 67's general reservation to revise the Guidebook. The record does not show the Company ever actually invoked page 67 against the arbitration terms, so Plaintiffs do not rest primarily on an illusory-promise theory. The narrower point is that page 67 carves out only at-will status by name, with no cross-reference to page 63, so the two provisions were presented in a single, undifferentiated electronic sitting with no reconciling language between them, the same ambiguity, construed against the Company as drafter, that supports the unconscionability showing in Part B below. If the two provisions cannot be reconciled at all, that conflict is itself evidence the parties reached no meeting of the minds on a material term, supporting denial at Question Two.

***B. The Manner of Presentation Was Procedurally Unconscionable, and the Provision's Remaining Terms Reinforce That Showing.***

Georgia examines both the process of contract formation and the fairness of the resulting terms, and adhesion alone is not enough. *See Innovative Images, LLC v. Summerville*, 309 Ga. 675, 679-82, 848 S.E.2d 75, 79-81 (2020); *NEC Technologies, Inc. v. Nelson*, 267 Ga. 390, 478 S.E.2d 769, 771-72, 774-75 (1996) (a term is unconscionable if "so one-sided ... that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice"); *see also Payne v. Savannah College of Art & Design, Inc.*, 81 F.4th 1187, 1193-96 (11th Cir. 2023). *Caley* forecloses treating the provision's injunctive-relief carve-out alone as dispositive of unconscionability, since mutuality of remedy is not required so long as both parties

arbitrate covered claims. 428 F.3d at 1377-78. Plaintiffs accordingly rely primarily on the procedural circumstances under which the provision was presented, which *Caley*'s policy did not share, treating the carve-out and undefined forum only as reinforcing evidence.

Procedurally, the arbitration terms reached Mr. Ward as pages 62 through 67 of a sixty-plus page packet assigned as a task within a newly created onboarding account when he returned to the Company in October 2024, following only a system-generated email describing the account setup process. Ward Aff. ¶¶ 17-19; Ex. 3 (Onboarding Correspondence) at 2 (Sept. 25, 2024 email). He completed the entire packet, including the Guidebook, in a single sitting of several minutes on October 2, 2024, Ward Aff. ¶ 20, on a platform that automatically scrolled him to each next signature or initial line without an opportunity to read the underlying content, and that would not let him complete onboarding, decline, negotiate, or skip a line without providing the signature. Ward Aff. ¶¶ 21-24, 26. Georgia generally presumes that a person who signs a readable contract knows its contents; the procedural showing here instead rests on the platform's own design, which foreclosed the individualized review that presumption assumes. The document metadata, already discussed at Question Two, corroborates the account: every other acknowledgment in the same session carries the identical mark, Justin Ward (Oct 2, 2024 10:52 EDT), while the arbitration initial alone carries none, Doc. 12-1, Ex. A at 63, 66-67; Ex. 4, raising a genuine question whether the platform captured a session-level timestamp rather than Mr. Ward's individualized review of and assent to each provision.

Two further circumstances reinforce, without independently establishing, procedural unconscionability: the provision reserves court access asymmetrically, for injunctive relief on claims (confidentiality, restrictive covenants) the Company would predictably bring with no comparable carve-out for Mr. Ward's statutory claims, Doc. 12-1, Ex. A at 62, and it names no

administrator or procedural rules, *id.*, although neither is independently dispositive given *Caley*, 428 F.3d at 1377-78, and the FAA's and Georgia's mechanisms for judicial appointment of a substitute arbitrator, 9 U.S.C. section 5; *AAA Restoration Co. v. Peek*, No. A15A0555 (Ga. Ct. App. July 14, 2015). Taken together, a take-it-or-leave-it presentation compressed into a single automated sitting, corroborated by the record's own timestamp pattern and reinforced by the asymmetric reservation of judicial access and the undefined forum, renders the provision procedurally unconscionable as applied to Mr. Ward, even if the Court concludes that an agreement was formed.

## IX. STAY, NOT DISMISSAL

Should the Court compel arbitration of any claim, the remedy is a stay, not dismissal. Plaintiffs affirmatively request a stay under 9 U.S.C. section 3 as to any claim compelled. Section 3 provides that the court "shall on application of one of the parties stay the trial of the action," and the Supreme Court has held that text mandatory: once a party requests a stay, the district court has no discretion to dismiss instead. *Smith v. Spizzirri*, 601 U.S. 472, 475-78 (2024). Defendants' authorities for dismissal, *Caley* and *Jackson v. Cintas Corp.*, 425 F.3d 1313 (11th Cir. 2005), Doc. 12 at 13-14, both predate *Spizzirri* by nearly two decades and cannot survive it.

A stay also preserves this Court's jurisdiction over any later application to confirm or vacate an award, since such applications require an independent jurisdictional basis that dismissal would put at risk, *Badgerow v. Walters*, 596 U.S. 1, 9-15 (2022), and maintains a single docket consistent with the interlocutory appellate structure Congress created. *See* 9 U.S.C. section 16; *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740-41 (2023). Dismissal is particularly incongruous where the Motion offers no Rule 12 merits ground and some claims remain before

this Court regardless. If the Georgia Arbitration Code rather than the FAA governs, Georgia law directs the same result: on an application to compel, the Code directs a summary hearing on validity or compliance and, once arbitration is compelled, a stay rather than dismissal. O.C.G.A. section 9-9-6(a).

## X. CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court address these questions in the order set forth above, articulate the grounds of its ruling to facilitate any subsequent review, and grant the following relief in the alternative and in the order stated:

(1) Deny the Motion in its entirety; or

(2) Defer ruling and permit narrowly confined discovery and an evidentiary hearing before any order compelling arbitration; or

(3) Deny the Motion and set a trial on formation under 9 U.S.C. section 4, with any preceding discovery confined to formation; or

(4) Compel only those claims and parties that satisfy every preceding question, stay those claims under 9 U.S.C. section 3, and permit the remaining claims and parties to proceed in this Court.

Respectfully submitted, this 18th day of August, 2026.

*/s/ Brandy Scott Mai*
Brandy Scott Mai
Georgia Bar No. 746703
101 Blue Moon Crossing, Suite 3-249
Pooler, Georgia 31322
Telephone: (910) 580-0380
Email: brandy@brandymai.com
*Counsel for Plaintiffs*

# Exhibit A-1: Affidavit of Justin Ward

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

**Justin Ward and Nikiya Ward,**

Plaintiffs,

v.

**J.C. Lewis Motor Company; Walter Lewis; Stephen Staton; Marjorie Solomon; and Mike Offer,**

Defendants.

CIVIL ACTION NO.
4:26-cv-00173-RSB-CLR

**AFFIDAVIT OF JUSTIN WARD**

**STATE OF GEORGIA**
**COUNTY OF** Chatham

Justin Ward, being first duly sworn, deposes and states as follows:

1. I am over eighteen years of age, competent to testify, and I have personal knowledge of the facts stated in this Affidavit.

2. I am one of the Plaintiffs in this action.

***Employment at J.C. Lewis Motor Company***

3. I was employed by J.C. Lewis Motor Company for approximately eight years, ending on March 25, 2026, when I was terminated.

4. I began at J.C. Lewis Motor Company as a salesperson in 2018 and have held the positions of Finance Manager, Sales Manager, and General Sales Manager.

5. At the time of my termination, I was employed as Sales Manager at J.C. Lewis Motor Company's Savannah, Georgia location.

6. J.C. Lewis Motor Company is a franchised Ford dealership.

***Interstate Dealer Trades***

7. As part of my recurring job duties as Sales Manager and General Sales Manager, I performed, oversaw, managed, and otherwise handled out-of-state dealer trades, typically multiple times per month.

8. A substantial portion of the out-of-state dealer trades I handled involved Ford dealerships located in states other than Georgia.

9. Out-of-state dealer trades require physical transportation of a motor vehicle across state lines.

10. For each out-of-state dealer trade I handled, I personally searched Ford Motor Company's Vehicle Locator system for specific vehicles, identified vehicles matching specific criteria, and personally contacted persons at out-of-state dealerships to arrange the trade.

11. For each dealer trade I handled with an out-of-state Ford dealership, I either personally performed the physical steps of pulling keys, driving the vehicle to a parking spot near the showroom, inspecting the vehicle, ensuring VIN numbers and features matched all documentation, and preparing it for interstate transport, or I directed a member of the sales staff to perform those steps under my supervision.

12. I personally arranged and dispatched interstate transportation for each dealer trade I handled, whether by dedicated dealer-transfer drivers or by members of the sales staff.

13. When incoming vehicles arrived at J.C. Lewis Motor Company from out-of-state dealerships, I either personally inspected them and drove them from the point where the interstate transporter unloaded them to the J.C. Lewis Motor Company service department, or directed a member of the sales staff to do so under my supervision.

14. I personally completed and signed dealer trade forms recording transactions I handled and then transmitted the documentation to J.C. Lewis Motor Company's corporate office.

15. Handling interstate dealer trades in the manner described above, including those performed under my direction and responsibility, was a regular and recurring part of my job duties at J.C. Lewis Motor Company since becoming a Sales Manager in 2022. These duties increased exponentially during the COVID vehicle inventory shortages.

16. My responsibilities in performing out-of-state dealer trades were understood based on my roles as Sales Manager and General Sales Manager and were carried out in accordance with the ordinary practice at J.C. Lewis Motor Company and Ford Motor Company.

***October 2024 Electronic Onboarding***

17. When I returned to J.C. Lewis Motor Company as Sales Manager in October 2024, electronically signing onboarding documents, including the Employee Guidebook, was assigned to me as one of several tasks within a new ADP software account that J.C. Lewis created specifically for this period of employment.

18. Other than a system-generated email instructing me to set up that new ADP account, I did not receive any email, message, or explanation describing the Employee Guidebook or the arbitration clause before I encountered it as a task to complete within the ADP system, nor did I receive any email notification or copy of the documents I signed.

19. Among the documents I was asked to sign electronically was the Employee Guidebook, which was more than sixty pages long.

20. I signed all of the onboarding documents, including the Employee Guidebook, in a single sitting. Based on my recollection, this took me several minutes to complete.

21. The electronic signing platform automatically scrolled through the pages of each document to bring me to the next signature or initial line. The system did not provide an opportunity to read the contents of the Guidebook before completing my signature.

22. No one at J.C. Lewis discussed the arbitration clause with me specifically, explained what rights I was giving up by signing it, or told me what arbitration meant.

23. The ADP e-signature platform did not provide any separate opportunities to skip signature lines or provide comments on any section.

24. I was not told that I could decline to sign the Agreement to Arbitrate, negotiate its terms, or that signing it was optional, nor did the system allow me to complete these documents without providing that signature.

25. I did not know that the Employee Guidebook or any document I signed on October 2, 2024, contained an agreement to arbitrate. I have never had any understanding or awareness of an arbitration agreement between myself and J.C. Lewis, before, during, or after that signing nor was I ever made aware of an arbitration policy in all my years working for J.C. Lewis.

26. I understood that completing the onboarding documents, including the Guidebook, was required to begin or continue my employment with J.C. Lewis.

All information is provided to the best of my belief, knowledge, and recollection.

[signature]
Justin Ward

Sworn to and subscribed before me this 13th day of August, 2026.

Notary Public: [signature]
My commission expires: 1/4/2028

Michael Patrick Pesaturo
NOTARY PUBLIC
Chatham County
State of Georgia
My Comm. Expires 01/04/2028

# Exhibit A-2: Ward W-2

# 2025 W-2 and EARNINGS SUMMARY

Employee Reference Copy
W-2 Wage and Tax Statement 2025
OMB No. 1545-0029
Copy C for employee's records.

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 997663 ATLA/JHQ | 100501 | | A 296 |

c Employer's name, address, and ZIP code
J C LEWIS MOTOR CO INC
9505 ABERCORN ST
SAVANNAH GA 31406

Batch #05232

e/f Employee's name, address, and ZIP code
JUSTIN BERNARD WARD
[redacted]

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 58-0325681 | XXX-XX-4174 |

[redacted]

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 19 Local income tax | 20 Locality name |

This blue section is your Earnings Summary which provides more detailed information on the generation of your W-2 statement. The reverse side includes instructions and other general information.

[redacted]

2. Employee Name and Address.

JUSTIN BERNARD WARD
[redacted]

* If you are claiming exempt from Federal Withholding, you are required to file a new W-4 form by February 16, 2026

€ 2025 ADP, Inc.

[redacted]

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 997663 ATLA/JHQ | 100501 | | A 296 |

c Employer's name, address, and ZIP code
J C LEWIS MOTOR CO INC
9505 ABERCORN ST
SAVANNAH GA 31406

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 58-0325681 | XXX-XX-4174 |

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 997663 ATLA/JHQ | 100501 | | A 296 |

c Employer's name, address, and ZIP code
J C LEWIS MOTOR CO INC
9505 ABERCORN ST
SAVANNAH GA 31406

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 58-0325681 | XXX-XX-4174 |

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 997663 ATLA/JHQ | 100501 | | A 296 |

c Employer's name, address, and ZIP code
J C LEWIS MOTOR CO INC
9505 ABERCORN ST
SAVANNAH GA 31406

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 58-0325681 | XXX-XX-4174 |

[redacted]

W-2 Wage and Tax Statement 2025
OMB No. 1545-0029
Copy B to be filed with employee's Federal Income Tax Return.

W-2 Wage and Tax Statement 2025
OMB No. 1545-0029
Copy 2 to be filed with employee's State Income Tax Return.

W-2 Wage and Tax Statement 2025
OMB No. 1545-0029
Copy 2 to be filed with employee's State Income Tax Return.

# Exhibit A-3: Onboarding Correspondence

Email addresses and identifying links to
internal company forms have been redacted

---------- Forwarded message ---------
From: **Justin Ward SR** [redacted]>
Date: Wed, Sep 25, 2024 at 11:44 AM
Subject: Re: Welcome to J.C. Lewis!
To: <[redacted]@jclewis.com>

Hello can you please call me at your earliest convenience [redacted] I have a few questions thanks
Sent from my iPhone

> On Sep 25, 2024, at 9:43 AM, Justin Ward SR [redacted] wrote:
>
> I accept the position.
>
> On Wed, Sep 25, 2024 at 8:52 AM <JCLewis.hr@adp.com> wrote:
>
>> Disclaimer: This email has been sent by the HR team at J.C. Lewis using ADP services.
>>
>> Dear Justin,
>>
>> On behalf of all of us at J.C. Lewis, it is my pleasure to welcome you to the team. We are looking forward to working with you.
>>
>> You can refer back to your offer letter at any time for your pay and start date information. If any adjustments need to be made, please reach out to me as I am the only company official who can adjust start dates. Feel free to ask me any questions as well.
>>
>> There are a few things you will be required to do between now and your start date and I will list them below.

1. Please complete the personal information form at the following link so that we are able to set you up in our payroll system:
https://forms.office.com [redacted]

2. The second form is just for your information and you don't have to do anything with it. It is just informing you of the identification we will require later when setting up your ADP account.

3. You will see a separate email come through from Checkr to initiate a background and MVR check. Please complete the authorization as soon as possible.

4. Once I have received everything from the three steps outlined above, I will then begin to set up your ADP account. You will then receive an email from ADP to set up your JC Lewis account. Note: You will not be able to use any existing ADP accounts. Once your account has been set up, you will have tasks to complete in ADP prior to your start date.

I will check in with you and remind you of any missed tasks or remind you of your start date and where to go.

On 10/14/2024, you will attend new hire orientation in our Pooler location starting at 9 am.

As we get closer to your start date, you will also receive an email from Ease concerning any employee benefits you may be eligible for. Other benefits will be covered in orientation.

If you have any questions before your first day, please don't hesitate to contact me. My email is [redacted]@jclewis.com. I will be your point of contact between now and your first day of employment.

All the best,

Ashley Eldridge

Note: You must use the same email you used to log in to the career center when applying for jobs.

---

> This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

---------- Forwarded message ---------
From: <[redacted]@adp.com>
Date: Tue, Sep 24, 2024 at 11:56 AM
Subject: Application Status - Sales Manager Position at J.C. Lewis
To: [redacted]>

Disclaimer: This email has been sent by the HR team at J.C. Lewis using ADP services.

Hi Justin,

We are delighted to offer you the position of Sales Manager at J.C. Lewis.

Our team was impressed by you during the interview process, and we are excited to have you join the company. We believe your skills and experience will make an excellent addition to the team.

You will find you offer at the following URL: Offer Letter

Please read the offer letter thoroughly as it includes your start date, pay rate, what to expect for your next steps, and instructions for your first day.

Please reach out to me directly with any questions or concerns between now and your anticipated start date. I will be your direct point of contact with coordinating your start date, new hire orientation, and all other required steps to get you started.

If the offer is accepted, you will soon see a Welcome email from me. This may go to your spam folder so please take a look!

We look forward to welcoming you to the team.

Respectfully,

Ashley Eldridge

Talent Acquisition Manager

J.C. Lewis

Please use the below link to access and respond to your offer letter.
https://workforcenow.adp.com/mascsr/default/mdf/recruitment/recruitment.html[redacted]

Note: You must use the same email you used to log in to the career center when applying for jobs.

# Exhibit A-4: Onboarding Document Signature Timestamps

# EXHIBIT __

## Onboarding Document Signature Timestamps

The images below are cropped excerpts from Justin Ward's October 2, 2024 electronic onboarding packet, showing only the signature/initial block and (where the document itself is not otherwise part of the record) minimal identifying text. Substantive policy content has been omitted from the non-public onboarding documents to avoid placing J.C. Lewis Motor Company's internal business materials in the public record; the full, unredacted documents are available to the Court and defense counsel on request under an appropriate confidentiality arrangement. The Employee Guidebook excerpts (pp. 63, 66, 67) are already part of the public record at Doc. 12-1, Ex. A, and are reproduced here for side-by-side comparison only.

Every timestamped signature across eight documents reads Justin Ward (Oct 2, 2024 10:52 EDT), the identical minute. The one mark in the entire packet without any timestamp is the Employee Initial on the Arbitration Acknowledgement itself, Guidebook p. 63.

ADP Employee Portal, Supporting Documents, Accessed August 12, 2026



| File Name | File Size | Uploaded By | Uploaded D... | Category | E-Signature |
|---|---|---|---|---|---|
| Proof of Identification #2 | 638 KB | | 10/02/2024 | Onboarding | |
| Proof of Identification #1 | 4181 KB | | 10/02/2024 | Onboarding | |
| Telephone Recording Dis... | 353 KB | | 10/02/2024 | Onboarding | |
| Security Policy | 1407 KB | | 10/02/2024 | Onboarding | |
| Privacy Policy | 199 KB | | 10/02/2024 | Onboarding | |
| New Health Insurance M... | 634 KB | | 10/02/2024 | Onboarding | |
| JC LEWIS - Guidebook ... | 752 KB | | 10/02/2024 | Onboarding | |
| F&I Receipting of Monie... | 3260 KB | | 10/02/2024 | Onboarding | |
| COBRA | 1709 KB | | 10/02/2024 | Onboarding | |

| | |
|---|---|
| File Name | ADP Workforce Now - Profile_Google Chrome_2026-08-12_ 10.39PM__@2x.png |
| Document Type | PNG image |
| File Size | 350 KB (349,894 bytes) |
| Creation Date | Aug 12, 2026 at 10:39 PM |
| Modification Date | Aug 12, 2026 at 10:39 PM |
| Image Size | 2494 × 996 pixels |
| Image DPI | 144 pixels/inch |
| Color Model | RGB |
| ColorSync Profile | Display P3 |

Screenshot showing 7 separate documents/policies that Mr. Ward's was required to e-sign as part of his onboarding. All 7 documents have a timestamped signature at exactly 10:52 EDT, with some documents having more than one signature or intial line.

Employee Guidebook, p. 63 (Doc. 12-1, Ex. A) - Arbitration Acknowledgement

understand that the arbitrator, who will serve as judge and jury, has the same authority to award money damages and other relief as does a judge or jury.

I also understand that, while the Employee Guidebook is otherwise subject to change at the Company's discretion, my employment at will status and this Agreement to Arbitrate and the Company's Employment Arbitration Policy and Procedure will be binding and irrevocable for the Company and me as written, unless mutually revoked in a written agreement signed by both parties.

Arbitration Acknowledgement

JDW
______________

Employee Initial



4880-8131-2403 v3

Employee Initial appears with NO timestamp visible anywhere on the page.

Employee Guidebook, p. 66 (Doc. 12-1, Ex. A) - Mutual Execution Page

**AFFIRMATION AND CONFIDENTIAL INFORMATION PROVISION; THAT I HAVE HAD THE OPPORTUNITY TO ASK QUESTIONS; AND THAT I UNDERSTAND THEIR MEANING AND REQUIREMENTS OF WHAT I AM SIGNING.**

Justin Ward (Oct 2, 2024 10:52 EDT)
Employee signature

Oct 2, 2024
Date

Justin Ward
Employee name (please print)

AGREED: For J. C. LEWIS MOTOR COMPANY

Employee signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. The Company's 'AGREED' line is blank.

Employee Guidebook, p. 67 (Doc. 12-1, Ex. A) - Guidebook Acknowledgement

**WRITTEN EMPLOYMENT AGREEMENT SIGNED BY THE CHIEF OPERATING OFFICER OR CHIEF HUMAN RESOURCE OFFICER AND ME AND DESIGNATED EXPRESSLY AS A "CONTRACT OF EMPLOYMENT." I UNDERSTAND THAT THIS GUIDEBOOK IS NOT AN EXPRESS OR IMPLIED CONTRACT OF EMPLOYMENT FOR A SPECIFIC TERM AND DOES NOT REQUIRE THE COMPANY TO POSSESS CAUSE FOR TERMINATING MY EMPLOYMENT.**

I FURTHER UNDERSTAND AND ACKNOWLEDGE THAT, WITH RESPECT TO ANY BENEFITS CURRENTLY OFFERED BY THE COMPANY, EMPLOYEES SHOULD REFER TO THE ACTUAL PLAN DOCUMENTS AND SUMMARY PLAN DESCRIPTIONS. THE COMPLETE PLAN DOCUMENTS GOVERN THE PLAN TERMS. BENEFITS MAY BE AMENDED, DECREASED, OR DISCONTINUED AT ANY TIME AS THE LAW ALLOWS, AND THE GUIDEBOOK IS NOT A CONTRACT OR PROMISE OF CONTINUED BENEFITS OF ANY KIND.

**BY ACCESSING THE ELECTRONIC, ONLINE VERSION OF THE GUIDEBOOK, I AM ACKNOWLEDGING AND/OR AGREEING (OR RE-AFFIRMING MY ACKNOWLEDGMENT OR AGREEMENT) TO THE STATEMENTS IN THIS ACKNOWLEDGMENT OR ANY UPDATED ELECTRONIC VERSION OF THE ACKNOWLEDGMENT.**

Justin Ward (Oct 2, 2024 10:52 EDT) Oct 2, 2024

Employee's Signature Date Date

Justin Ward

Employee's Name (Printed)

Employee signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)', identical to p. 66.

COBRA Notice - separately listed ADP onboarding item

enroll in an individual conversion health plan provided by the Insurance Company, provided such conversion health plan is offered.)

If you have any questions about COBRA, please contact **Ceridian Benefits at 800-877-7994.** Also, if you have changed marital status, or you or your spouse have changed addresses, you will need to notify Ceridian.

Justin Ward (Oct 2, 2024 10:52 EDT) Oct 2, 2024

Employee Signature Date

Signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. Body text of this legally-required notice omitted; only the signature block is reproduced.

Certification Regarding Cash Reporting and Money Laundering - separately listed ADP onboarding item

I understand that any violation of this policy will result in the termination my employment.
AGREED this 2nd day of October, 2024 .

Employee (Signature): Justin Ward (Oct 2, 2024 10:52 EDT)

Signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. Substantive policy content omitted; only the signature block is reproduced.

Policy Statement: Dealership Integrity - separately listed ADP onboarding item

**RECEIPT OF THIS NOTICE IS ACKNOWLEDGED BELOW:**

Justin Ward (Oct 2, 2024 10:52 EDT) Oct 2, 2024

**SIGNATURE** **DATE** **WITNESS** **DATE**

*J.C. LEWIS MOTOR COMPANY*
9505 *Abercorn Street P.O. Box 60759*
*Savannah, Georgia 31420*
*(912) 925-0234*

Signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. Substantive policy content omitted; only the signature block and letterhead are reproduced.

IT Security Policy (final page) - separately listed ADP onboarding item

will continuously strive to improve our Security measures to stay resilient against evolving threats.

Justin Ward (Oct 2, 2024 10:52 EDT)
Justin Ward

Oct 2, 2024

Signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. Substantive policy content omitted; only the closing line and signature block are reproduced.

Telephone Recordings Consent - separately listed ADP onboarding item

TO: ALL DEALERSHIP PERSONNEL
SUBJECT: TELEPHONE RECORDINGS

J. C. Lewis Ford is implementing a dealership wide phone recording system in order to better serve our customers while protecting the integrity of the dealership. Please sign the acknowledgment below as all employees must be made aware of the recordings and that they may be reviewed by dealership management.

**I UNDERSTAND THAT BOTH INCOMING AND OUTGOING CALLS ON THE J.C. LEWIS FORD PHONE SYSTEM MAY BE RECORDED AND REVIEWED AND THAT I GIVE MY PERMISSION AND CONSENT TO THESE RECORDINGS.**

Justin Ward
Print Name

Justin Ward (Oct 2, 2024 10:52 EDT)
Signature

Oct 2, 2024
Date

Signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. Reproduced in full; this is a two-sentence consent notice with no confidential business content.

# Exhibit A-1: Affidavit of Justin Ward

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

**Justin Ward and Nikiya Ward,**

Plaintiffs,

v.

**J.C. Lewis Motor Company; Walter Lewis; Stephen Staton; Marjorie Solomon; and Mike Offer,**

Defendants.

CIVIL ACTION NO.
4:26-cv-00173-RSB-CLR

**AFFIDAVIT OF JUSTIN WARD**

**STATE OF GEORGIA**
**COUNTY OF** Chatham

Justin Ward, being first duly sworn, deposes and states as follows:

1. I am over eighteen years of age, competent to testify, and I have personal knowledge of the facts stated in this Affidavit.

2. I am one of the Plaintiffs in this action.

***Employment at J.C. Lewis Motor Company***

3. I was employed by J.C. Lewis Motor Company for approximately eight years, ending on March 25, 2026, when I was terminated.

4. I began at J.C. Lewis Motor Company as a salesperson in 2018 and have held the positions of Finance Manager, Sales Manager, and General Sales Manager.

5. At the time of my termination, I was employed as Sales Manager at J.C. Lewis Motor Company's Savannah, Georgia location.

6. J.C. Lewis Motor Company is a franchised Ford dealership.

***<u>Interstate Dealer Trades</u>***

7. As part of my recurring job duties as Sales Manager and General Sales Manager, I performed, oversaw, managed, and otherwise handled out-of-state dealer trades, typically multiple times per month.

8. A substantial portion of the out-of-state dealer trades I handled involved Ford dealerships located in states other than Georgia.

9. Out-of-state dealer trades require physical transportation of a motor vehicle across state lines.

10. For each out-of-state dealer trade I handled, I personally searched Ford Motor Company's Vehicle Locator system for specific vehicles, identified vehicles matching specific criteria, and personally contacted persons at out-of-state dealerships to arrange the trade.

11. For each dealer trade I handled with an out-of-state Ford dealership, I either personally performed the physical steps of pulling keys, driving the vehicle to a parking spot near the showroom, inspecting the vehicle, ensuring VIN numbers and features matched all documentation, and preparing it for interstate transport, or I directed a member of the sales staff to perform those steps under my supervision.

12. I personally arranged and dispatched interstate transportation for each dealer trade I handled, whether by dedicated dealer-transfer drivers or by members of the sales staff.

13. When incoming vehicles arrived at J.C. Lewis Motor Company from out-of-state dealerships, I either personally inspected them and drove them from the point where the interstate transporter unloaded them to the J.C. Lewis Motor Company service department, or directed a member of the sales staff to do so under my supervision.

14. I personally completed and signed dealer trade forms recording transactions I handled and then transmitted the documentation to J.C. Lewis Motor Company's corporate office.

15. Handling interstate dealer trades in the manner described above, including those performed under my direction and responsibility, was a regular and recurring part of my job duties at J.C. Lewis Motor Company since becoming a Sales Manager in 2022. These duties increased exponentially during the COVID vehicle inventory shortages.

16. My responsibilities in performing out-of-state dealer trades were understood based on my roles as Sales Manager and General Sales Manager and were carried out in accordance with the ordinary practice at J.C. Lewis Motor Company and Ford Motor Company.

***October 2024 Electronic Onboarding***

17. When I returned to J.C. Lewis Motor Company as Sales Manager in October 2024, electronically signing onboarding documents, including the Employee Guidebook, was assigned to me as one of several tasks within a new ADP software account that J.C. Lewis created specifically for this period of employment.

18. Other than a system-generated email instructing me to set up that new ADP account, I did not receive any email, message, or explanation describing the Employee Guidebook or the arbitration clause before I encountered it as a task to complete within the ADP system, nor did I receive any email notification or copy of the documents I signed.

19. Among the documents I was asked to sign electronically was the Employee Guidebook, which was more than sixty pages long.

20. I signed all of the onboarding documents, including the Employee Guidebook, in a single sitting. Based on my recollection, this took me several minutes to complete.

21. The electronic signing platform automatically scrolled through the pages of each document to bring me to the next signature or initial line. The system did not provide an opportunity to read the contents of the Guidebook before completing my signature.

22. No one at J.C. Lewis discussed the arbitration clause with me specifically, explained what rights I was giving up by signing it, or told me what arbitration meant.

23. The ADP e-signature platform did not provide any separate opportunities to skip signature lines or provide comments on any section.

24. I was not told that I could decline to sign the Agreement to Arbitrate, negotiate its terms, or that signing it was optional, nor did the system allow me to complete these documents without providing that signature.

25. I did not know that the Employee Guidebook or any document I signed on October 2, 2024, contained an agreement to arbitrate. I have never had any understanding or awareness of an arbitration agreement between myself and J.C. Lewis, before, during, or after that signing nor was I ever made aware of an arbitration policy in all my years working for J.C. Lewis.

26. I understood that completing the onboarding documents, including the Guidebook, was required to begin or continue my employment with J.C. Lewis.

All information is provided to the best of my belief, knowledge, and recollection.

[signature]
Justin Ward

Sworn to and subscribed before me this 13th day of August, 2026.

Notary Public: [signature]
My commission expires: 1/4/2028

Michael Patrick Pesaturo
NOTARY PUBLIC
Chatham County
State of Georgia
My Comm. Expires 01/04/2028

# Exhibit A-2: Ward W-2

# 2025 W-2 and EARNINGS SUMMARY

Employee Reference Copy
**W-2** Wage and Tax Statement **2025**
OMB No. 1545-0029
Copy C for employee's records.

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 997663 ATLA/JHQ | 100501 | | A 296 |

c Employer's name, address, and ZIP code
J C LEWIS MOTOR CO INC
9505 ABERCORN ST
SAVANNAH GA 31406

Batch #05232

e/f Employee's name, address, and ZIP code
JUSTIN BERNARD WARD
[redacted]

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 58-0325681 | XXX-XX-4174 |

[redacted]

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 19 Local income tax | 20 Locality name |

**This blue section is your Earnings Summary which provides more detailed information on the generation of your W-2 statement. The reverse side includes instructions and other general information.**

[redacted]

**2. Employee Name and Address.**

JUSTIN BERNARD WARD
[redacted]

* **If you are claiming exempt from Federal Withholding, you are required to file a new W-4 form by February 16, 2026**

© 2025 ADP, Inc.

[redacted]

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 997663 ATLA/JHQ | 100501 | | A 296 |

c Employer's name, address, and ZIP code
J C LEWIS MOTOR CO INC
9505 ABERCORN ST
SAVANNAH GA 31406

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 58-0325681 | XXX-XX-4174 |


| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 997663 ATLA/JHQ | 100501 | | A 296 |

c Employer's name, address, and ZIP code
J C LEWIS MOTOR CO INC
9505 ABERCORN ST
SAVANNAH GA 31406

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 58-0325681 | XXX-XX-4174 |

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 997663 ATLA/JHQ | 100501 | | A 296 |

c Employer's name, address, and ZIP code
J C LEWIS MOTOR CO INC
9505 ABERCORN ST
SAVANNAH GA 31406

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 58-0325681 | XXX-XX-4174 |


[redacted]

**W-2** Wage and Tax Statement **2025** OMB No. 1545-0029
Copy B to be filed with employee's Federal Income Tax Return.

**W-2** Wage and Tax Statement **2025** OMB No. 1545-0029
Copy 2 to be filed with employee's State Income Tax Return.

**W-2** Wage and Tax Statement **2025** OMB No. 1545-0029
Copy 2 to be filed with employee's State Income Tax Return.

# Exhibit A-3: Onboarding Correspondence

Email addresses and identifying links to
internal company forms have been redacted

---------- Forwarded message ---------
From: **Justin Ward SR** [redacted]>
Date: Wed, Sep 25, 2024 at 11:44 AM
Subject: Re: Welcome to J.C. Lewis!
To: <[redacted]@jclewis.com>

Hello can you please call me at your earliest convenience [redacted] I have a few questions thanks
Sent from my iPhone

> On Sep 25, 2024, at 9:43 AM, Justin Ward SR [redacted] wrote:
>
> I accept the position.
>
> On Wed, Sep 25, 2024 at 8:52 AM <JCLewis.hr@adp.com> wrote:
>
> > Disclaimer: This email has been sent by the HR team at J.C. Lewis using ADP services.
> >
> > Dear Justin,
> >
> > On behalf of all of us at J.C. Lewis, it is my pleasure to welcome you to the team. We are looking forward to working with you.
> >
> > You can refer back to your offer letter at any time for your pay and start date information. If any adjustments need to be made, please reach out to me as I am the only company official who can adjust start dates. Feel free to ask me any questions as well.
> >
> > There are a few things you will be required to do between now and your start date and I will list them below.

1. Please complete the personal information form at the following link so that we are able to set you up in our payroll system:
https://forms.office.com [redacted]

2. The second form is just for your information and you don't have to do anything with it. It is just informing you of the identification we will require later when setting up your ADP account.

3. You will see a separate email come through from Checkr to initiate a background and MVR check. Please complete the authorization as soon as possible.

4. Once I have received everything from the three steps outlined above, I will then begin to set up your ADP account. You will then receive an email from ADP to set up your JC Lewis account. Note: You will not be able to use any existing ADP accounts. Once your account has been set up, you will have tasks to complete in ADP prior to your start date.

I will check in with you and remind you of any missed tasks or remind you of your start date and where to go.

On 10/14/2024, you will attend new hire orientation in our Pooler location starting at 9 am.

As we get closer to your start date, you will also receive an email from Ease concerning any employee benefits you may be eligible for. Other benefits will be covered in orientation.

If you have any questions before your first day, please don't hesitate to contact me. My email is [redacted]@jclewis.com. I will be your point of contact between now and your first day of employment.

All the best,

Ashley Eldridge

Note: You must use the same email you used to log in to the career center when applying for jobs.

---

> This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

---------- Forwarded message ---------
From: <[redacted]@adp.com>
Date: Tue, Sep 24, 2024 at 11:56 AM
Subject: Application Status - Sales Manager Position at J.C. Lewis
To: [redacted]>

Disclaimer: This email has been sent by the HR team at J.C. Lewis using ADP services.

Hi Justin,

We are delighted to offer you the position of Sales Manager at J.C. Lewis.

Our team was impressed by you during the interview process, and we are excited to have you join the company. We believe your skills and experience will make an excellent addition to the team.

You will find you offer at the following URL: Offer Letter

Please read the offer letter thoroughly as it includes your start date, pay rate, what to expect for your next steps, and instructions for your first day.

Please reach out to me directly with any questions or concerns between now and your anticipated start date. I will be your direct point of contact with coordinating your start date, new hire orientation, and all other required steps to get you started.

If the offer is accepted, you will soon see a Welcome email from me. This may go to your spam folder so please take a look!

We look forward to welcoming you to the team.

Respectfully,

Ashley Eldridge

Talent Acquisition Manager

J.C. Lewis

Please use the below link to access and respond to your offer letter.
https://workforcenow.adp.com/mascsr/default/mdf/recruitment/recruitment.html[redacted]

Note: You must use the same email you used to log in to the career center when applying for jobs.

# Exhibit A-4: Onboarding Document Signature Timestamps

# EXHIBIT __

## Onboarding Document Signature Timestamps

The images below are cropped excerpts from Justin Ward's October 2, 2024 electronic onboarding packet, showing only the signature/initial block and (where the document itself is not otherwise part of the record) minimal identifying text. Substantive policy content has been omitted from the non-public onboarding documents to avoid placing J.C. Lewis Motor Company's internal business materials in the public record; the full, unredacted documents are available to the Court and defense counsel on request under an appropriate confidentiality arrangement. The Employee Guidebook excerpts (pp. 63, 66, 67) are already part of the public record at Doc. 12-1, Ex. A, and are reproduced here for side-by-side comparison only.

Every timestamped signature across eight documents reads Justin Ward (Oct 2, 2024 10:52 EDT), the identical minute. The one mark in the entire packet without any timestamp is the Employee Initial on the Arbitration Acknowledgement itself, Guidebook p. 63.

ADP Employee Portal, Supporting Documents, Accessed August 12, 2026

| File Name | File Size | Uploaded By | Uploaded D... | Category | E-Signature |
|---|---|---|---|---|---|
| Proof of Identification #2 | 638 KB | | 10/02/2024 | Onboarding | |
| Proof of Identification #1 | 4181 KB | | 10/02/2024 | Onboarding | |
| Telephone Recording Dis... | 353 KB | | 10/02/2024 | Onboarding | |
| Security Policy | 1407 KB | | 10/02/2024 | Onboarding | |
| Privacy Policy | 199 KB | | 10/02/2024 | Onboarding | |
| New Health Insurance M... | 634 KB | | 10/02/2024 | Onboarding | |
| JC LEWIS - Guidebook ... | 752 KB | | 10/02/2024 | Onboarding | |
| F&I Receipting of Monie... | 3260 KB | | 10/02/2024 | Onboarding | |
| COBRA | 1709 KB | | 10/02/2024 | Onboarding | |

| | |
|---|---|
| File Name | ADP Workforce Now - Profile_Google Chrome_2026-08-12_ 10.39PM__@2x.png |
| Document Type | PNG image |
| File Size | 350 KB (349,894 bytes) |
| Creation Date | Aug 12, 2026 at 10:39 PM |
| Modification Date | Aug 12, 2026 at 10:39 PM |
| Image Size | 2494 × 996 pixels |
| Image DPI | 144 pixels/inch |
| Color Model | RGB |
| ColorSync Profile | Display P3 |

Screenshot showing 7 separate documents/policies that Mr. Ward's was required to e-sign as part of his onboarding. All 7 documents have a timestamped signature at exactly 10:52 EDT, with some documents having more than one signature or intial line.

Employee Guidebook, p. 63 (Doc. 12-1, Ex. A) - Arbitration Acknowledgement

understand that the arbitrator, who will serve as judge and jury, has the same authority to award money damages and other relief as does a judge or jury.

I also understand that, while the Employee Guidebook is otherwise subject to change at the Company's discretion, my employment at will status and this Agreement to Arbitrate and the Company's Employment Arbitration Policy and Procedure will be binding and irrevocable for the Company and me as written, unless mutually revoked in a written agreement signed by both parties.

Arbitration Acknowledgement

JDW

____________

Employee Initial



Employee Initial appears with NO timestamp visible anywhere on the page.

Employee Guidebook, p. 66 (Doc. 12-1, Ex. A) - Mutual Execution Page

**AFFIRMATION AND CONFIDENTIAL INFORMATION PROVISION; THAT I HAVE HAD THE OPPORTUNITY TO ASK QUESTIONS; AND THAT I UNDERSTAND THEIR MEANING AND REQUIREMENTS OF WHAT I AM SIGNING.**

Justin Ward (Oct 2, 2024 10:52 EDT)
Employee signature

Oct 2, 2024
Date

Justin Ward
Employee name (please print)

AGREED: For J. C. LEWIS MOTOR COMPANY

Employee signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. The Company's 'AGREED' line is blank.

Employee Guidebook, p. 67 (Doc. 12-1, Ex. A) - Guidebook Acknowledgement

**WRITTEN EMPLOYMENT AGREEMENT SIGNED BY THE CHIEF OPERATING OFFICER OR CHIEF HUMAN RESOURCE OFFICER AND ME AND DESIGNATED EXPRESSLY AS A "CONTRACT OF EMPLOYMENT." I UNDERSTAND THAT THIS GUIDEBOOK IS NOT AN EXPRESS OR IMPLIED CONTRACT OF EMPLOYMENT FOR A SPECIFIC TERM AND DOES NOT REQUIRE THE COMPANY TO POSSESS CAUSE FOR TERMINATING MY EMPLOYMENT.**

I FURTHER UNDERSTAND AND ACKNOWLEDGE THAT, WITH RESPECT TO ANY BENEFITS CURRENTLY OFFERED BY THE COMPANY, EMPLOYEES SHOULD REFER TO THE ACTUAL PLAN DOCUMENTS AND SUMMARY PLAN DESCRIPTIONS. THE COMPLETE PLAN DOCUMENTS GOVERN THE PLAN TERMS. BENEFITS MAY BE AMENDED, DECREASED, OR DISCONTINUED AT ANY TIME AS THE LAW ALLOWS, AND THE GUIDEBOOK IS NOT A CONTRACT OR PROMISE OF CONTINUED BENEFITS OF ANY KIND.

**BY ACCESSING THE ELECTRONIC, ONLINE VERSION OF THE GUIDEBOOK, I AM ACKNOWLEDGING AND/OR AGREEING (OR RE-AFFIRMING MY ACKNOWLEDGMENT OR AGREEMENT) TO THE STATEMENTS IN THIS ACKNOWLEDGMENT OR ANY UPDATED ELECTRONIC VERSION OF THE ACKNOWLEDGMENT.**

Justin Ward (Oct 2, 2024 10:52 EDT) ____________ Oct 2, 2024 ____________

Employee's Signature Date Date

Justin Ward ____________

Employee's Name (Printed)

Employee signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)', identical to p. 66.

COBRA Notice - separately listed ADP onboarding item

enroll in an individual conversion health plan provided by the Insurance Company, provided such conversion health plan is offered.)

If you have any questions about COBRA, please contact **Ceridian Benefits at 800-877-7994.** Also, if you have changed marital status, or you or your spouse have changed addresses, you will need to notify Ceridian.

Justin Ward (Oct 2, 2024 10:52 EDT) Oct 2, 2024

Employee Signature Date

Signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. Body text of this legally-required notice omitted; only the signature block is reproduced.

Certification Regarding Cash Reporting and Money Laundering - separately listed ADP onboarding item

I understand that any violation of this policy will result in the termination my employment.

AGREED this 2nd day of October, 2024 .

Employee (Signature): Justin Ward (Oct 2, 2024 10:52 EDT)

Signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. Substantive policy content omitted; only the signature block is reproduced.

Policy Statement: Dealership Integrity - separately listed ADP onboarding item

**RECEIPT OF THIS NOTICE IS ACKNOWLEDGED BELOW:**

Justin Ward (Oct 2, 2024 10:52 EDT) Oct 2, 2024

SIGNATURE DATE WITNESS DATE

*J.C. LEWIS MOTOR COMPANY*
9505 *Abercorn Street P.O. Box 60759*
*Savannah, Georgia 31420*
*(912) 925-0234*

Signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. Substantive policy content omitted; only the signature block and letterhead are reproduced.

IT Security Policy (final page) - separately listed ADP onboarding item

will continuously strive to improve our Security measures to stay resilient against evolving threats.

Justin Ward (Oct 2, 2024 10:52 EDT)

Justin Ward

Oct 2, 2024

Signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. Substantive policy content omitted; only the closing line and signature block are reproduced.

Telephone Recordings Consent - separately listed ADP onboarding item

TO: ALL DEALERSHIP PERSONNEL
SUBJECT: TELEPHONE RECORDINGS

J. C. Lewis Ford is implementing a dealership wide phone recording system in order to better serve our customers while protecting the integrity of the dealership. Please sign the acknowledgment below as all employees must be made aware of the recordings and that they may be reviewed by dealership management.

**I UNDERSTAND THAT BOTH INCOMING AND OUTGOING CALLS ON THE J.C. LEWIS FORD PHONE SYSTEM MAY BE RECORDED AND REVIEWED AND THAT I GIVE MY PERMISSION AND CONSENT TO THESE RECORDINGS.**

Justin Ward

Print Name

Justin Ward (Oct 2, 2024 10:52 EDT) Oct 2, 2024

Signature Date

Signature stamped 'Justin Ward (Oct 2, 2024 10:52 EDT)'. Reproduced in full; this is a two-sentence consent notice with no confidential business content.